ANDERSON BROS. FORD ET AL. *v.* VALENCIA ET AL.

No. 80–84.  Argued March 23, 1981—Decided June 8, 1981

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and BRENNAN and MARSHALL, JJ., joined, *post*, p. 223.

*Aaron J. Kramer* argued the cause and filed briefs for petitioners.

*Alan A. Alop* argued the cause for respondents. With him on the brief were *James O. Latturner* and *James D. Weill.**

---

*Peter D. Schellie* filed a brief for the Consumer Bankers Association et al. as *amici curiae* urging reversal.

*Richard Scupi* filed a brief for the UAW Legal Services Plan as *amicus curiae* urging affirmance.

*Richard J. Rubin* filed a brief for Indian Pueblo Legal Services, Inc., as *amicus curiae.*

JUSTICE WHITE delivered the opinion of the Court.

The issue presented in this case is whether an assignment of certain unearned insurance premiums created a "security interest" that should have been disclosed pursuant to the Truth in Lending Act (TILA), 82 Stat. 146, as amended, 15 U. S. C. § 1601 *et seq.*[1]

## I

In September 1977, respondents purchased an automobile from petitioner Anderson Bros. Ford. They signed the dealer's standard automobile retail installment contract. This contract was assigned for value to petitioner Ford Motor Credit Co. A provision on the face of the contract disclosed that the seller retained a security interest in the automobile.[2] A provision on the back of the contract stated that the buyer was required to purchase and maintain physical damage insurance on the automobile, "protecting the interests of Buyer and Seller," and further stated:

> "Buyer hereby assigns to Seller any monies payable under such insurance, by whomever obtained, including returned or unearned premiums, and Seller hereby is authorized on behalf of both Buyer and Seller to receive or collect same, to endorse checks or drafts in payment thereof, to cancel such insurance or to release or settle any claim with respect thereto. The proceeds from such insurance, by whomever obtained, shall be applied toward replacement of the Property or payment of the indebtedness hereunder in the sole discretion of Seller."

---

[1] The Truth in Lending Act was enacted as Title I of the Consumer Credit Protection Act, 82 Stat. 146.

[2] The provision stated:

"Security Interest: Seller shall have a security interest under the Uniform Commercial Code in the Property (described above) and in the proceeds thereof to secure the payment in cash of the Total of Payments and all other amounts due or to become due hereunder."

The "Property" was defined as the automobile.

If the insurance policy on the automobile were canceled for any reason prior to the expiration of the term of the policy, this provision would permit the creditor to apply any unearned insurance premiums toward payment of the remaining debt.[3]

In October 1977, before making any payments on the installment contract or on the insurance policy, respondents returned the automobile to Anderson Bros. Ford. They subsequently brought this action in federal court,[4] alleging, *inter alia,* that the sales contract violated the TILA because it did not disclose on the face of the contract that the seller had acquired a "security interest" in unearned insurance premiums.[5]

---

[3] Respondents contend that under the contract provision quoted above, unearned insurance premiums could only be used to replace the automobile or to make payments on the buyer's debt. Petitioners assert that "[u]nder the assignment provision . . . any unearned [insurance] premiums will be used to provide replacement insurance coverage or applied to the debt." Brief for Petitioners 4. The Court of Appeals stated that the unearned premiums "may be used to purchase replacement insurance coverage," citing petitioners' brief on appeal. 617 F. 2d 1278, 1281 (CA7 1980). We need not resolve the proper interpretation of this contract provision to decide the issue before us.

[4] The TILA authorizes suits against original creditors and their assignees. 15 U. S. C. §§ 1614 and 1640.

[5] The TILA does not state that the disclosure required by the statute must be made on the face of the contract. It simply provides:

"Each creditor shall disclose clearly and conspicuously, in accordance with the regulations of the Board, to each person to whom consumer credit is extended, the information required under this part or part D of this subchapter." 15 U. S. C. § 1631 (a).

However, the applicable Federal Reserve Board regulations provide:

"All of the [required] disclosures shall be made together on either:

"(1) The note or other instrument evidencing the obligation on the same side of the page and above the place for the customer's signature; or

"(2) One side of a separate statement which identifies the transaction." 12 CFR § 226.8 (a) (1980).

See also 12 CFR § 226.8 (b)(5) (1980). Petitioners do not challenge the validity or applicability of this regulation.

This claim was based on § 128 (a)(10) of the TILA, which provides in pertinent part:

"In connection with each consumer credit sale not under an open end credit plan, the creditor shall disclose each of the following items which is applicable:

.        .        .        .        .

"A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates." 82 Stat. 155, 15 U. S. C. § 1638 (a)(10).

This disclosure requirement is essentially repeated in § 226.8 (b)(5) of Regulation Z, a Federal Reserve Board regulation promulgated pursuant to the Board's authority under § 105 of the TILA.[6] Under the regulation, a creditor must disclose:

"A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates . . . ." 12 CFR § 226.8 (b)(5) (1980).

Respondents sought statutory damages, attorney's fees, and costs.[7]

---

[6] Section 105 of the TILA, as set forth in 15 U. S. C. § 1604, provides:
"The Board shall prescribe regulations to carry out the purposes of this subchapter. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith."

[7] A consumer who files an individual action against a creditor for failure to make the disclosures required by the TILA may recover twice the amount of the finance charge, with a minimum recovery of $100 and a maximum recovery of $1,000, or may recover any actual damages sus-

The District Court granted summary judgment for respondents, holding that an assignment of unearned insurance premiums creates a "security interest" within the meaning of § 128 (a)(10). App. 33–35. The Court of Appeals for the Seventh Circuit affirmed. 617 F. 2d 1278 (1980). Recognizing that the TILA does not define the term "security interest," the Court of Appeals relied on the definition contained in Regulation Z:

> " 'Security interest' and 'security' mean any interest in property which secures payment or performance of an obligation. The terms include, but are not limited to, security interests under the Uniform Commercial Code, real property mortgages, deeds of trust, and other consensual or confessed liens whether or not recorded, mechanic's, materialmen's, artisan's, and other similar liens, vendor's liens in both real and personal property, the interest of a seller in a contract for the sale of real property, any lien on property arising by operation of law, and any interest in a lease when used to secure payment or performance of an obligation." 12 CFR § 226.2 (gg) (1980).

The Court of Appeals concluded that the assignment of unearned insurance premiums created an "interest in property which secure[d] payment or performance of an obligation" within the meaning of Regulation Z, and thus created a "security interest" that must be disclosed under § 128 (a) (10). The Court of Appeals accordingly affirmed the judgment below.[8]

---

tained as a result of the failure to disclose. 15 U. S. C. § 1640 (a). Respondents did not contend that they had suffered any actual damages as a result of the alleged TILA violation.

[8] Two judges filed separate concurring opinions, joining in the opinion for the panel but expressing concern that by requiring the prominent disclosure of an "incidental" security interest, the court was increasing the

We granted certiorari to settle whether such an assignment of unearned insurance premiums must be disclosed as a "security interest" under the TILA.[9]  449 U. S. 981 (1980). We reverse.

## II

Although the Court of Appeals' construction of the Act and of Regulation Z is shared by three of the four other Courts of Appeals that have ruled on the question,[10] this view, which is essentially a claim that the plain language of the statute and the regulation requires the result reached by

complexity of the disclosures required by the TILA without furthering the purposes of the statute.

Judge Cudahy stated in his concurring opinion:

"I do not read [the opinion for the panel] as seriously suggesting that the result we reach furthers the underlying purposes of the Truth in Lending Act. Among these meritorious purposes are the disclosure to buyers of the costs of credit and the alerting of customers to the possibility that their property may be reached to satisfy the obligation which they have incurred.

"Here we require the prominent disclosure of a rather esoteric right to unearned premiums for physical damage insurance (protecting both the seller's and the buyer's interest in the property), which may be used to provide replacement insurance coverage or applied against the buyer's debt in the event of cancellation of the insurance. This 'security interest' is normal in the circumstances but is entirely incidental to the principal consumer credit transaction. . . .

"To disclose this 'security interest' on the *face* of the contract (which is the point here) is merely to add virtually inconsequential information—lengthening, complicating and trivializing the disclosure for no apparent benefit." 617 F. 2d, at 1293.

[9] We also granted certiorari to consider petitioners' contention that if we were to hold that disclosure of an assignment of unearned insurance premiums is required under the TILA, our ruling should be made prospective only. Since we hold that such disclosure is not required, we need not address that issue.

[10] See *Murphy* v. *Ford Motor Credit Co.*, 629 F. 2d 556 (CA8 1980); *Edmondson* v. *Allen-Russell Ford, Inc.*, 577 F. 2d 291 (CA5 1978); *Gennuso* v. *Commercial Bank & Trust Co.*, 566 F. 2d 437 (CA3 1977).

the court below, has recently been challenged on several fronts. First, based in part on the legislative history of the 1980 amendments to the TILA, see *infra*, at 218–219, the Court of Appeals for the Tenth Circuit has concluded that the meaning of the term "security interest" as used in the TILA is not so plain and has held that the creditor's interest in unearned insurance premiums need not be disclosed as a security interest under either the statute or Regulation Z. *James v. Ford Motor Credit Co.*, 638 F. 2d 147 (1980).

Second, in September 1980, the Board, the agency that issued Regulation Z, published for comment Official Staff Interpretation FC–0173, regarding security interest disclosures in closed-end consumer credit transactions. 45 Fed. Reg. 63295. Although the staff recognized that several courts held a contrary view, its clearly expressed position was that neither § 226.2 (gg) nor § 226.8 (b)(5) requires a creditor to disclose as a security interest its right to receive insurance proceeds or unearned premiums from a property insurance policy:

> "The staff believes that a creditor is not required by [§ 226.8 (b)(5)] to disclose its right to receive insurance proceeds or unearned insurance premiums nor to disclose that it is named as loss payee or beneficiary on an insurance policy. Truth in Lending disclosures are meant to provide useful information to consumers to enhance credit shopping. Consumers do need to know that they risk the loss of certain property if they default. The disclosures under § 226.8 (b)(5) inform consumers of which property is subject to that risk at the time the credit decision is being made. We believe that information regarding the creditor's interest in insurance proceeds and unearned premiums would not be used in comparison shopping. Although a technical reading of the security interest definition might cover a creditor's interest in insurance proceeds and unearned premiums, it is our opinion that such incidental interests are not

the type of interests meant to be covered by § 226.8 (b) (5)." *Ibid.*

This construction of Regulation Z, the staff concluded, "better serves the purpose of the statute and the regulation to convey in a meaningful way information that can be used by consumers in shopping for credit." *Ibid.*

We are aware that after we granted certiorari in this case, the Board deferred final action on FC–0173; but we cannot agree that the staff's views expressed in the proposed ruling are wholly without significance. The comment period on the proposed interpretation expired on October 24, 1980, the proposal has not been withdrawn or revised, and it appears from the Board's public statement that final action was deferred only because it was "inappropriate" to do otherwise in the light of our intervening grant of certiorari. *Id.,* at 84074.

We need not, however, rest on FC–0173 for the Board's construction of the statute or of Regulation Z with respect to the scope of the security interest disclosure requirement. On March 31, 1980, the President approved the Truth in Lending Simplification and Reform Act (1980 Act) as Title VI of the Depository Institutions Deregulation and Monetary Control Act of 1980. 94 Stat. 168. The 1980 Act, which will be fully effective on April 1, 1982, will amend the TILA in many respects but will leave substantial portions of the TILA unchanged. It will amend § 128 (a)(10) of the TILA to require a creditor to make the following disclosure with respect to any "security interest" acquired by the creditor in a closed-end consumer credit transaction:

> "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type." § 614 (a)(9), 94 Stat. 179.

Like the TILA, however, the 1980 Act does not define the term "security interest."

The 1980 Act provides that all implementing regulations must be promulgated at least one year prior to the effective date of the Act and that any creditor may comply with the revised regulations prior to the effective date of the Act. § 625, 94 Stat. 185–186. The Board accordingly revised Regulation Z, effective April 1, 1981, but with compliance being optional until April 1, 1982. 46 Fed. Reg. 20848 (1981). Section 226.18 (m) of revised Regulation Z requires the creditor to disclose in connection with closed-end consumer credit transactions

> "[t]he fact that the creditor has or will acquire a security interest in the property purchased as part of the transaction, or in other property identified by item or type." *Id.,* at 20903.

Section 226.2 (a)(25) defines the term "security interest" as follows:

> " *'Security interest'* means an interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law. It does not include incidental interests such as interests in proceeds, accessions, additions, fixtures, insurance proceeds (whether or not the creditor is a loss payee or beneficiary), premium rebates, or interests in after-acquired property. For purposes of disclosure under §§ 226.6 and 226.18, the term does not include an interest that arises solely by operation of law. However, for purposes of the right of rescission under §§ 226.15 and 226.23, the term does include interests that arise solely by operation of law." *Id.,* at 20894.

Although the new regulation changes the Board's prior definition of a "security interest" in some respects,[11] there is

---

[11] For example, the revised regulation excludes a creditor's interest in

no indication that the definition was being changed with respect to unearned premiums. When the Board issued revised Regulation Z, the Board explained that it distinguishes an incidental interest in unearned insurance premiums from a "security interest" that must be disclosed:

> "[T]here is a difference between an incidental interest and an interest that is the essence of the transaction. For example, when an automobile is financed, the insurance proceeds are incidental to the primary security interest, the automobile. The creditor's interest in such insurance would not be a security interest under the regulation. On the other hand, when the credit transaction is the financing of an insurance policy, the creditor's interest in that policy is just like a purchase money security interest and would be disclosed as a security interest." [12]

after-acquired property from the definition of a "security interest." The regulations implementing the TILA, however, expressly require disclosure of a creditor's interest in after-acquired property. See 12 CFR § 226.8 (b)(5) (1980).

[12] 46 Fed. Reg. 20853 (1981).

The Board's analysis demonstrates that the staff's proposed official interpretation of Regulation Z does not conflict with FRB Public Information Letter No. 377, cited by respondents. FRB Public Information Letter No. 377 is an informal staff interpretation of Regulation Z that was issued in 1970. The interpretation was requested by a loan company whose customers purchased single premium lifetime accidental death and dismemberment policies with the proceeds of their loans. The loan company was designated as the owner of the policy and retained the right to cancel the policy and apply any premium refund to the unpaid balance of the loan if the customer defaulted on the loan. The staff responded: "Under the circumstances, we think it would be appropriate to disclose the loan company's ownership of the policy as a type of 'security interest' . . . ." CCH [1969–1974 Transfer Binder] Cons. Cred. Guide ¶ 30,555.

Petitioners contend that the loan company's interest in the policy differs from petitioners' interest in the unearned insurance premiums in this case. The loan company's interest "was not merely incidental or subordinate to some far more significant interest securing payment of the loan." Reply

Since this reasoning applies to the TILA as well as to the 1980 Act, we do not understand the Board to have revised Regulation Z with respect to whether an incidental interest in unearned insurance premiums must be disclosed.[13] The Board's revised regulation construes the statutory term "se-

Brief for Petitioners 9, n. 12. We agree with petitioners that the situation described in the letter is distinguishable from this case.

One other informal staff interpretation of Regulation Z referred to disclosure of unearned insurance premiums. In FRB Public Information Letter No. 1263, the staff responded to an inquiry regarding how an interest in unearned insurance premiums should be identified. The letter pointed out that "a more fundamental matter [is] whether a security interest exists at all" and then suggested that the creditor determine whether as a matter of state law he had acquired an interest in property securing payment of the debt. CCH [1974–1977 Transfer Binder] Cons. Cred. Guide ¶ 31,736. "[A]ssuming this is a security interest for purposes of Regulation Z, the determination of what type of security interest it is should be made in accordance with State law." *Ibid.* This informal interpretation did not resolve whether disclosure of a creditor's interest in unearned insurance premiums is required under the TILA. Although this letter focused on state law, revised Regulation Z defines a "security interest" as an "interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law." 46 Fed. Reg. 20894 (1981).

[13] When the Board issued proposed regulations implementing the 1980 Act, it stated that the 1980 Act had clarified "certain complex legal questions" regarding the proper interpretation of the TILA, including questions about adequate disclosure of security interests. 45 Fed. Reg. 80731, 80733 (1980).

In its commentary accompanying the revised regulations, 46 Fed. Reg. 20853 (1981), the Board noted that its definition of "security interest" was considerably narrower than § 226.2 (gg) of the unrevised regulation, in that it excluded a number of interests that would have been considered security interests under the unrevised regulation. Some of these interests were identified. The Board went on to observe that "there is a difference between an incidental interest and an interest that is the essence of the transaction." *Ibid.* Only the latter must be disclosed as a "security interest." We do not understand the Board's commentary to indicate in any way that the revised regulation altered the meaning of Regulation Z with respect to whether a creditor must disclose an interest in unearned insurance premiums in a transaction such as is involved in this case.

curity interest" which appears, undefined, in both the TILA and the 1980 Act; it also defines the term "security interest" appearing in the revised·regulation. The same term had been used in the original Regulation Z, and it seems to us that the Board's definition of "security interest" in the revised regulation is persuasive authority as to whether an interest in unearned insurance premiums should be disclosed as a "security interest" under the unrevised regulation. As we see it, the term "security interest" as used in both the revised and unrevised versions of Regulation Z does not include an interest in unearned insurance premiums in a transaction such as this.

Under the TILA and the 1980 Act, the Board is authorized to prescribe regulations, which "may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper" to carry out the purposes of the statute.[14] In light of this statutory authority, we should not expressly or by implication invalidate as contrary to the statute the Board's revised regulation concerning disclosure of security interests, which with respect to the disclosure of interests in unearned premiums did not purport to change the original Regulation Z and reiterates the view expressed in FC–0173 that an interest in unearned premiums is not a "security interest" for purposes of the disclosure provision.[15]

---

[14] 15 U. S. C. § 1604. This section will be renumbered § 1604 (a) under the 1980 Act. 94 Stat. 170.

[15] Because we do not understand the exclusion of unearned insurance premiums from the definition of "security interest" to have changed the administrative construction of the statute, we need not consider whether if the revised regulation had worked such a change, the case should be decided under the revised regulation which was effective as of April 1, 1981. See *Bradley* v. *Richmond School Board,* 416 U. S. 696, 711 (1974); *Thorpe* v. *Housing Authority,* 393 U. S. 268, 281–283 (1969); *United States* v. *Schooner Peggy,* 1 Cranch 103, 110 (1801).

The legislative history of the 1980 Act fully supports the Board's revised regulation regarding disclosure of a creditor's interest in unearned insurance premiums and its proposed interpretation of the unrevised regulation. The Report of the Senate Committee on Banking, Housing, and Urban Affairs on the 1980 Act explained:

> "When a security interest is being taken in property purchased as part of the credit transaction, this section requires a statement that a security interest has been or will be taken in the property purchased. When a security interest is being taken in property not purchased as part of the credit transaction, the Committee intends this provision to require a listing by item or type of the property securing the transaction, but not a listing of related or incidental interests in the property. For example, a loan secured by an automobile (not being purchased with the proceeds of the loan) would require a statement indicating that the loan is secured by an automobile but would not require a listing of incidental or related rights which the creditor may have such as insurance proceeds or unearned insurance premiums, rights arising under, or waived in accord with state law, accessions, accessories, or proceeds." S. Rep. No. 96–368, p. 30 (1979).[16]

Furthermore, on the floor of the Senate a member of the responsible Committee observed:

> "Many cases have resulted from the complex security interest disclosure requirements under the law. An il-

---

[16] Although the Committee Report states that the creditor is not required to disclose his "incidental interest" in unearned insurance premiums if the loan is secured by an automobile that is not purchased with the proceeds of the loan, there is no sensible reason for applying a different rule if the loan is secured by an automobile that is purchased with the proceeds of the loan. In either situation the 1980 Act requires the creditor to disclose any "security interest" he has acquired.

lustrative case is *Gennuso* v. *Commercial Bank and Trust Co.,* 455 F. Supp. 461 (W. D. Pa. 1976); 566 F. 2d 437, (3rd Cir. 1977), which required the creditor's right in property insurance proceeds and unearned property insurance premiums, to be disclosed as a 'security interest.' Although as presently written the law does not require that result, S. 108 should prevent such ludicrous interpretations by requiring merely a positive indication if a security interest is being taken in the property purchased and if it is in property not being purchased in the transaction, simply a general listing of the type of property without a listing of incidental related interests." 125 Cong. Rec. 9160 (1979).

With one exception, not pertinent here, the Committee Chairman, Senator Proxmire, who was the sponsor of the TILA, agreed with these remarks. *Id.,* at 9159, 9972. In light of these indications from the 1980 Act's history, it is unlikely that the courts would invalidate as contrary to the 1980 Act or the TILA either the security interest disclosure provisions with respect to unearned insurance premiums in revised Regulation Z or the interpretation of the unrevised regulation contained in FC–0173.

### III

Of course, neither the legislative history of the 1980 Act nor the Board's construction of the term "security interest" under either the TILA or the 1980 Act conclusively establishes the meaning of these words in the TILA. But as we so plainly recognized in *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555 (1980), absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation. We discern no such repugnance with any provision in the TILA.

The purpose of the TILA is to promote the "informed use of credit" by consumers. 15 U. S. C. § 1601. See *Ford*

*Motor Credit Co.* v. *Milhollin, supra,* at 559, 568; *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356, 363–368 (1973). Congress sought to assure "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U. S. C. § 1601.

The TILA was enacted in May 1968. As originally drafted, the House and Senate truth-in-lending bills focused primarily on the cost of credit.[17] Neither bill required disclosure of security interests acquired by a creditor in connection with a consumer credit transaction. In January 1968, while the legislation was under consideration in the House, Representative Cahill, who was not a member of the Committee that had reported out the bill, offered several amendments designed "to improve the truth-in-lending provisions with respect to mortgage transactions." 114 Cong. Rec. 1611 (1968). One of the amendments, which was adopted without debate, required the following disclosure in closed-end consumer credit transactions:

> "[A] description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates." *Id.,* at 1610.[18]

This provision became § 128 (a)(10) of the TILA.

---

[17] The 1967 Committee Reports explained that "by requiring all creditors to disclose credit information in a uniform manner, and by requiring all additional mandatory charges imposed by the creditor as an incident to credit [to] be included in the computation of the applicable percentage rate, the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit." H. R. Rep. No. 1040, 90th Cong., 1st Sess., 13; S. Rep. No. 392, 90th Cong., 1st Sess., 3 (virtually identical language).

[18] Representative Cahill proposed that this language be added to § 203 (b) of H. R. 11601, governing disclosures for consumer credit sales other than sales under an open-end credit plan. Section 203 (b) later became § 128 of the TILA, 15 U. S. C. § 1638. He proposed that the same

The Cahill amendments were principally designed to prevent homeowners from being victimized by "vicious secondary mortgage schemes." *Id.*, at 1611. It was explained that "in many cases [a homeowner entering into a consumer credit transaction] is never informed nor aware that his home is being made subject to a mortgage." *Ibid.* The amendment would require the creditor to disclose that he was acquiring a security interest in the borrower's residence. Insofar as pertinent here, the Cahill amendments were accepted by the Senate and became part of the TILA as finally adopted.[19]

language be added to § 203 (c) of H. R. 11601, governing disclosures for extensions of credit other than sales under an open-end credit plan. Section 203 (c) later became § 129 of the TILA, 15 U. S. C. § 1639.

[19] In drawing the Senate's attention to Representative Cahill's amendments, the sponsor of the Senate truth-in-lending bill, stated:

"Congressman CAHILL, of New Jersey, has offered an important amendment to the truth-in-lending bill which tightens up on the second mortgage racket. First, it would require a 3-day waiting period before a second mortgage transaction can be completed. Second, it would require a disclosure of the fact that credit is being secured by a mortgage on the homeowner's property. Third, the amendment increases the legal rights of consumers with respect to those who purchase mortgages from the original home improvement contractor." 114 Cong. Rec. 5024 (1968).

In presenting the Conference Report on the TILA to the House, Representative Sullivan explained that the House conferees had succeeded in retaining the protections created by the Cahill amendments. She described those amendments as "a series of amendments in the House, to strike at home improvement racketeers who trick homeowners, particularly the poor, into signing contracts at exorbitant rates, which turn out to be liens on the family residences. Any credit transaction which involves a security interest in property must be clearly explained to the consumer as involving a mortgage or lien; any such transaction involving the consumer's residence—other than in a purchase-money first mortgage for the acquisition of the home—carries a 3-day cancellation right." *Id.*, at 14388.

Similarly, Senator Proxmire, presenting the Conference Report on the truth-in-lending bill to the Senate, described the Cahill amendments as providing "additional safeguards in the second mortgage area" and explained that the security interest disclosure provisions would require creditors to "describe any security interest in real property—such as a second mortgage—arising from the credit transaction." *Id.*, at 14488.

Despite the focus on the second mortgage problem, Congress did not limit § 128 (a)(10) to security interests in real property. The statutory language requires disclosure of "any security interest held or to be retained or acquired by the creditor." It is thus uncontested that § 128 (a)(10) requires a creditor to disclose to a consumer purchasing an automobile or other property on credit that the creditor retains a security interest in the property purchased.

Unaided by an administrative construction of the TILA and Regulation Z, a court could easily conclude, based on the language of the statute and of Regulation Z, that the interest in unearned insurance premiums acquired by the creditor in this case should be characterized as a "security interest" that must be disclosed. But, in light of the proposed official staff interpretation of Regulation Z, the revised regulation defining a "security interest," and the Board's commentary on the difference between an "incidental interest" in unearned insurance premiums and a "security interest," it is evident that the Board does not consider the creditor's interest in unearned insurance premiums in a transaction such as this one to be a "security interest" that must be disclosed under the TILA. The Board's position is supported by the legislative history of both the TILA and the 1980 Act, and we hold that it is a permissible interpretation of the term "security interest" as used in the TILA.[20] Although designed to provide meaningful guidance to consumers in

---

[20] This Court has frequently relied on the principle that "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459 (1892). See, *e. g., Steelworkers* v. *Weber,* 443 U. S. 193, 201 (1979); *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 849 (1975). "When aid to construction of the meaning of words, as used in the statute [or regulation], is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States* v. *American Trucking Assns.,* 310 U. S. 534, 543–544 (1940) (footnote omitted).

shopping for credit, the TILA as originally drafted did not require disclosure of or otherwise deal with security interests; and the security interest disclosure provision was added to the TILA because of Congress' particular concern about the need to warn consumers of the creditor's acquisition of a particular type of security interest—a second mortgage on the borrower's home. The Board's view that disclosure of a creditor's incidental interest in unearned insurance premiums would not measurably further the TILA's purpose of aiding consumers to shop for credit, and that the term "security interest" as used in the TILA, the 1980 Act, and in Regulation Z should not be construed as including such an interest, is consistent with the underlying purpose of the TILA. This interpretation of the term "security interest" strikes a balance between "meaningful disclosure" and "informational overload." [21] As we emphasized in *Milhollin*, the task of striking the proper balance is "an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices." Administrative agencies are "better suited than [the] courts to engage in such a process." 444 U. S., at 568–569.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEWART, with whom THE CHIEF JUSTICE, JUSTICE BRENNAN, and JUSTICE MARSHALL join, dissenting.

The Court correctly states that the respondents in this case maintain "that the plain language of the statute and the

---

[21] In *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555 (1980), we stressed that the TILA seeks to provide "meaningful disclosure" of credit terms:

"*Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure . . . and

regulation requires the result reached by the court below."
*Ante,* at 211–212. Yet the Court nowhere attempts a direct
answer to the respondents' contention. Despite the elemen-
tary principle that the starting point in construing a statute
is the language of the statute itself, the Court simply ignores
the plain language of the TILA and the equally plain lan-
guage of the only applicable Federal Reserve Board construc-
tion of it. Instead, the Court contrives to discover contrary
legislative intent in such dubious materials as the legislative
history of a subsequent statute which does not cover the
transaction at hand, a regulation issued to implement that
inapplicable statute, and an unofficial administrative staff in-
terpretation which, by its own express terms, is a mere pro-
posal intended to have no legal effect.[1]

In my opinion, the statutory language at issue here un-
equivocally supports the decision of the Court of Appeals,
and should itself dispose of this case. See *United States* v.
*Wiltberger,* 5 Wheat. 76, 95–96 (Marshall, C. J.). But even
were the Court justified in leaping over the language of Con-
gress in search of a conflicting indication of congressional
intent, the secondary authority on which the Court relies does
not withstand examination. As a result, the Court does
damage to settled principles of administrative law and statu-
tory construction—damage that could extend to issues of far
greater moment than the very narrow question under the
Truth in Lending Act at issue here.

---

the need to avoid . . . [informational overload].'" *Id.,* at 568, quoting
S. Rep. No. 96–73, p. 3 (1979) (accompanying the 1980 Act).

[1] The Court does indirectly refer to the plain language of the TILA
when it concedes that "[u]naided by an administrative construction of the
TILA and Regulation Z, a court could easily conclude, based on the lan-
guage of the statute and Regulation Z, that the interest in unearned insur-
ance premiums acquired by the creditor in this case should be character-
ized as a 'security interest' that must be disclosed." *Ante,* at 222. But
the Court does not rely on the one administrative construction that
resolves any possible uncertainty in the statutory language, see 12 CFR
§ 226.2 (gg) (1980), and never explains why any further aid is necessary.

Section 128 (a) (10) of the TILA requires the creditor to disclose

"[a] description of *any security interest* held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates." 15 U. S. C. § 1638 (a) (10) (emphasis added).[2]

The word "any" can only mean exactly what it says, and so the sole question is whether the credit company's right to the consumer's unearned insurance premium is a "security interest." The credit contract requires the consumer to buy physical damage insurance "protecting the interests of Buyer and Seller," and grants to the seller any unearned insurance premiums, to be "applied toward replacement of the Property or payment of the indebtedness hereunder in the sole discretion of Seller." If unaided common sense cannot identify the seller's rights under this clause as a "security interest," the language of the applicable Federal Reserve Board definition of "security interest" under the TILA quickly and unmistakably does so:

" 'Security interest' and 'security' mean any interest in property which secures payment or performance of an obligation. The terms *include, but are not limited to,* security interests under the Uniform Commercial Code, real property mortgages, deeds of trust, and other consensual or confessed liens whether or not recorded, mechanic's, materialmen's, artisan's, and other similar liens, vendor's liens in both real and personal property, the in-

---

[2] Regulation Z virtually duplicates the statutory language, requiring a creditor to disclose

"[a] description or identification of the type of *any* security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates . . . ." 12 CFR § 226.8 (b) (5) (1980) (emphasis added).

terest of a seller in a contract for the sale of real property, any lien on property arising by operation of law, and any interest in a lease when used to secure payment or performance of an obligation." 12 CFR § 226.2 (gg) (1980) (emphasis added).

Ford's assignment clause clearly meets the Federal Reserve Board definition. First, the assignment clause plainly creates an interest in property. In this case, the annual premium for physical damage insurance was $215, and in other instances it could be considerably higher. The amount of the unearned insurance premium acquired by the creditor will depend on the timing of the cancellation which triggers the creditor's rights under the assignment clause. But except in the rare case in which the repossession of the car precisely coincides with the end of the insurance term, the creditor will be able to recover a refund of some sort, and since repossession might occur right after a new term of insurance begins, the contract essentially represents an interest equal to the value of the premium itself.[3]

Second, the assignment clause clearly "secure[s] payment or performance of an obligation." The contract expressly

---

[3] The assignment clause may therefore be of more than minor significance to a buyer. It would allow the creditor to attach, without full court procedure, perhaps hundreds of dollars which the buyer has spent on insurance for a car which he no longer possesses. A consumer might well want to avoid giving his creditor such a right, and so disclosure of the assignment might well advance the congressional goal of informed credit shopping by consumers. 15 U. S. C. § 1601. But in any event, where the language of the statute clearly covers this security interest, it is not for the courts to assess the significance of the interest.

The Court quotes, apparently with approval, the concurring opinion of Judge Cudahy of the Court of Appeals in this case, which laments that disclosure of the "virtually inconsequential information" about the assignment of the insurance premiums trivializes the disclosure "for no apparent benefit." *Ante,* at 211, n. 8. Even were Judge Cudahy right about the value of the disclosure at issue here, he, unlike today's Court, did not allow his own appraisal of the question to obscure unequivocal statutory language.

states that the creditor is to use any refunded premiums for "replacement of the Property or payment of the indebtedness hereunder." Even if Ford is correct in asserting that the purpose of the assignment is to continue the insurance coverage on the car during the life of the loan, see *ante,* at 208, n. 3, the assignment is still a security interest under Regulation Z, since it will be used to secure performance of the buyer's obligation to maintain insurance coverage.[4] The applicable statute and regulation thus both clearly declare the assignment of unearned insurance premiums to be a security interest which must be disclosed on the face of the credit contract.[5]

Virtually ignoring the Federal Reserve Board definition of "security interest" in § 226.2 (gg) of Regulation Z—the applicable administrative pronouncement which effectively settles the issue in favor of the respondents—the Court relies instead on an unofficial staff interpretation which, by its own

---

[4] Even if the comprehensive language with which the applicable version of Regulation Z begins were insufficient to demonstrate that the assignment clause is a security interest under the TILA, the assignment falls within at least two of the nonexhaustive enumerated examples in the definition. Clauses assigning unearned insurance premiums may well qualify as "consensual . . . liens whether or not recorded," 12 CFR § 226.2 (gg) (1980), or "security interests under the Uniform Commercial Code," see Ill. Rev. Stat., ch. 26, ¶¶ 1–201 (37), 9–102 (2), 9–306, 9–312 (1979).

[5] The Court seeks to find some support for its restrictive reading of the TILA in the legislative history of the Act. Representative Cahill, who introduced the "security interest" provision in the House, stated that the primary reason for the provision was to combat the second-mortgage schemes to which many homeowners had fallen prey, and sponsors of the provision in both Houses appear to have reinforced this view. But the quoted statements from the legislative history do not purport to be explanations of specific statutory language. Rather, they are generalized declarations about the primary purpose of the bill, and so do not preclude other situations clearly covered by the language of the statute. Indeed, the Court seems to agree, recognizing that the narrow focus of the quoted legislative history on the problem of second mortgages on real estate cannot possibly explain the broad language of § 128 (a)(10). *Ante,* at 222.

228

terms, is entitled to no weight whatsoever. In September 1980, the Board released Proposed Official Staff Interpretation FC–0173, 45 Fed. Reg. 63295, asking for comments on a proposed staff opinion that a creditor's right to unearned insurance premiums is not required to be disclosed under the statute. The proposal expressly stated:

"(2) The letter is being issued as a proposal, rather than in final form, and interested persons are invited to submit relevant comment.

"(3) After comments are considered, this official staff interpretation may be amended, may be withdrawn or may remain unchanged."

The Board went on to tell creditors in a November 1980 mailing that "[t]his proposed interpretation may not be relied upon until final action is taken." As the Court correctly notes, the Board has never taken any final action. On December 16, 1980, it deferred further consideration indefinitely.[6] The Court's reliance on this proposal therefore directly contravenes the intention of the proposal itself—that it is to have *no* legal effect.[7]

---

[6] Conceding, as it must, that the Board took no final action on the proposal, the Court offers two unpersuasive reasons for nevertheless according it weight in interpreting the statute. *Ante,* at 213. First, the Court notes that the period for public comment ended on October 24, 1980. That fact hardly justifies treating the proposed rule as final, because we do not know the views expressed in the comments received, nor can we speculate on whether those comments would have reinforced or altered the staff's view on the statutory question at hand. Second, the Court states that the Board deferred final action only because it thought final action was inappropriate in light of our grant of certiorari in the present case. I do not see how this purported ground for deferral indicates what the Board would have done had it not deferred final action. If anything, we might assume that the Board thought its opinion on the issue unnecessary in light of the impending decision by this Court. If so, it is rather curious that the Court believes it can rely on the proposal.

[7] That the Board intended the proposal to have no legal effect finds further proof in the unusual procedure the Board used in issuing the pro-

Whatever the significance of the present case, the Court's approach threatens general damage to important principles of administrative law and statutory interpretation. An administrative agency issues proposals to invoke public comment which the agency can evaluate and assimilate in formulating new regulations. If an agency is to infer from the Court's opinion that its proposals may be ascribed significant or even decisive weight in litigation involving construction of the statute governing the agency, it may take any of three extremely unfortunate courses. First, an agency may decide not to issue proposals at all for fear of binding itself in future action. Second, an agency may rush to issue ill-conceived proposals in the hope of affecting the decisions of courts or the conduct of regulated persons, evading the risks and responsibilities of submitting its proposals to public comment and other rulemaking procedures. Third, an agency may frame its proposals in interrogative, rather than declarative, form, thereby denying itself the benefit of public comments that evaluate or interpret the precise language of a hypothetical final rule. The Court's use of FC–1073 here thus threatens to undermine the very purpose of public comment in rulemaking procedures.[8]

---

posal. Normally, a creditor requests the Board for an official interpretation of a statutory or regulatory provision. The Board will then issue an official interpretation, and then decide whether to request public comment. If it does so, the interpretation is withdrawn while comments are received; otherwise, the official interpretation stands. *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555, 567, n. 10. For FC–1073, however, the Board never issued an official interpretation, but only a proposal, and immediately requested public comment.

[8] The Court's reliance on FC–1073 finds no support in our decision in *Ford Motor Credit Co.* v. *Milhollin, supra.* The Court there stated that *"absent a clear expression,* it becomes necessary to consider the implicit character of the statutory scheme." *Id.,* at 560 (emphasis added). In that case, the Court found no clear expression in the statute or regulation on the question whether the creditor had to disclose an acceleration clause on the face of the agreement, and therefore found it necessary and proper

The Court continues its attack on established principles of statutory construction by invoking the Truth in Lending Simplification and Reform Act of 1980 to help it discover the meaning of the TILA, which was enacted 12 years earlier. First, the Court considers the revised sections of Regulation Z issued by the Board to implement the new statute, and in a remarkable *ipse dixit,* pronounces that the new definition, which excludes such "incidental interests" as liens on insurance premiums, reveals "no indication that the definition was being changed with respect to unearned premiums." *Ante,*

to defer to the views of the Federal Reserve Board staff in construing the statute. *Ibid.* Here, by contrast, the statute and definitional rule combine in an unequivocally clear expression on the disclosure issue.

Moreover, in *Milhollin,* the Court inferred a congressional preference for resolving interpretive issues by *"uniform* administrative decision." *Id.,* at 568 (emphasis added). But FC–1073 hardly represents a uniform Board view of the statute. As quoted by the Court, the proposal concedes that a "technical reading of the security interest definition might cover a creditor's interest in insurance proceeds and unearned insurance premiums," but concludes that "it is our opinion that such *incidental* interests are not the type of interests meant to be covered by § 226.8 (b) (5)." *Ante,* at 212–213 (emphasis added).

What FC–1073 calls a "technical reading" of the Board definition of "security interest" in § 226.2 (gg) of Regulation Z is in fact the only permissible reading of that definition. The proposal letter effectively concedes that it is in conflict with the applicable official Board regulation, and nothing in Regulation Z supports the view in the proposal that 15 U. S. C. § 1638 (a) (10), which speaks of "any" security interest, was intended to exclude "incidental" interests. FC–1073 thus directly contravenes the higher administrative authority of an official regulation. The proposal, indeed, also conflicts with at least one other informal staff interpretation by the Board. In FRB Public Information Letter No. 377, CCH [1969–1974 Transfer Binder] Cons. Cred. Guide ¶ 30,555, the Board expressly told an inquiring creditor that he should disclose to the debtor that in the event of default the credit company could cancel the life insurance policy the debtor was to buy with the loan money, and could apply any premium refund to the balance of the loan. Contrary to the Court's suggestion, *ante,* at 215–216, n. 12, Letter No. 377 does not rely on the notion that in that instance, as opposed to the present case, the credit was extended expressly to enable the consumer to buy insurance.

at 215. The new definition is, of course, utterly inconsistent with the earlier definition. The Court then mistakenly declares that the Board explanation for the new definition published in the Federal Register in 1981 "applies to the TILA as well as to the 1980 Act." *Ante,* at 216.[9]

To compound the error, the Court goes on to examine the legislative history of the 1980 Simplification Act. There is no suggestion that the new statute applies retroactively, and there could not be. Rather, the Court states that the legislative history of the 1980 Act "fully supports the Board's *revised* regulation . . . and its proposed interpretation of the *unrevised* regulation." *Ante,* at 218 (emphasis added). Since the new regulation, issued to implement a new nonretroactive statute, cannot apply to the case at hand, I cannot understand how it is at all relevant in this case that the new regulation is consistent with the new statute.

The legislative history of the 1980 Act cited by the Court, *ante,* at 218–219, proves the perfectly reasonable—and irrelevant—proposition that the new Regulation Z properly construes the intent of the 1980 Act in excluding liens on unearned insurance premiums as security interests. But nothing in the Report of the Senate Committee on Banking, Housing, and Urban Affairs suggests any intent to construe the old law applicable to this case. "If the legislative history . . . indicates anything, it is that Congress thought that it was changing the law by changing the language of the Act." *United States* v. *Plesha,* 352 U. S. 202, 208. Doubtless Congress thought the TILA deficient, but that is why it wrote a new law.

The Court also cites a statement by Senator Garn purportedly attributing to the TILA a meaning contrary to its

---

[9] The explanation states: "This definition [of 'security interest'] is based on § 226.2 (gg) of the current regulation, but is *much narrower.* The revised definition lists a number of interests *that have been considered security interests under the current regulation but no longer will be* . . . ." 46 Fed. Reg. 20853 (1981) (emphasis added).

plain language. *Ante,* at 218–219. But the postenactment pronouncements of individual legislators purporting to construe an earlier statute have little, if any, weight in the judicial construction of the statute. *E. g., Quern* v. *Mandley,* 436 U. S. 725, 736, n. 10. And according any weight to the pronouncements of a single legislator is particularly unjustified when the legislator, like Senator Garn in this case, was not even a Member of Congress when the law was enacted. *United States* v. *Mine Workers,* 330 U. S. 258, 281–282.[10]

The Court believes that requiring disclosure of an assignment of unearned insurance premiums on the face of the credit contract would be a gratuitous "informational overload" of no significant benefit to the consumer. *Ante,* at 223. But when the statute and regulation governing the transaction speak unambiguously to the contrary, any independent judgment about the psychology and economics of consumer credit is not for the Court to make.[11]

I respectfully dissent.

---

[10] There are other reasons why Senator Garn's statement merits little weight. First, the statement was written and inserted in the Congressional Record, rather than made on the floor of the Senate. Second, Senator Garn's opinion is not reflected in the Report of the Committee, of which he was a member.

[11] Indeed, even were it appropriate for the Court to proffer its own view about the practical necessity of a particular credit disclosure, the Court's view is at least questionable. Disclosing an assignment of unearned insurance premiums might be of considerable interest to the credit-shopping consumer. See n. 3, *supra.* And far from creating an "informational overload," such a disclosure could result in replacing convoluted assignment language, such as that on the back of the contract in this case, with a simple statement that "the buyer gives the creditor an interest in the vehicle and in all insurance charges," such as the statement Ford, in response to the nationwide litigation over this issue, now includes on the face of its contracts.