OPINION *Page 2 
{¶ 1} Appellant, Ohio Fresh Eggs, LLC ("Fresh Eggs"), appeals from an order of the Environmental Review Appeals Commission ("ERAC") that reversed the decision of the Director of the Ohio Environmental Protection Agency ("OEPA") dismissing the verified complaint of appellee, Robert Bear. Because the director's dismissal of Bear's verified complaint was not unlawful for lack of a promulgated rule, and because Bear's remaining substantive challenge to the director's decision is unavailing, we reverse.
 {¶ 2} The facts underlying this appeal are undisputed. Fresh Eggs owns and operates an egg production facility in Marseilles, Ohio. Bear owns land adjacent to Fresh Eggs where he and his family have resided since 1967. Fresh Eggs' property was used as farmland before Fresh Eggs' predecessor, Buckeye Egg Farm ("Buckeye Egg"), received OEPA's permission to construct a 14-barn facility capable of housing approximately 2.5 million chickens. OEPA approved Buckeye Egg's attempt to expand the facility from 14 to 16 barns, ERAC affirmed it, and this court addressed it in Concerned Citizens of Central Ohio v.Schregardus (2002), 148 Ohio App.3d 31 ("Concerned Citizens II"). Fresh Eggs purchased the facility in February 2004.
 {¶ 3} On March 10, 2004, Bear filed a verified complaint alleging Fresh Eggs' facility was violating Ohio's air pollution laws by emitting air contaminants without an air pollution control permit. Two OEPA employees from the Division of Air Pollution Control ("DAPC") investigated Bear's allegations by (1) inspecting the Fresh Eggs facility, (2) reviewing current and historical documents pertaining to the facility's operation and land use, and (3) examining evidence pertaining to Concerned Citizens II. Based upon their investigation, the two employees determined Fresh Eggs was engaged in agricultural *Page 3 
activities that met the five exemption criteria under R.C. 3704.01(B). They therefore concluded "DAPC has no permitting requirements for this facility at this time." (ERAC Certified Record, Index No. 2.)
 {¶ 4} The OEPA director concurred in the DAPC employees' conclusion and dismissed Bear's complaint. Noteworthy to this appeal, the director determined the phrase "agricultural production activities" encompasses both crop production and egg production, the latter being a subcategory of poultry husbandry. While Bear contended Fresh Eggs failed to satisfy the second criterion in R.C. 3704.01(B), exempting emissions from agricultural productions activities that were established prior to adjacent nonagricultural activities, the director disagreed. With the scope of agricultural productions activities determined, the director consulted a 1939 aerial photograph of the properties of both Bear and Fresh Eggs and concluded Fresh Eggs' property (1) "has been continuously used for one type of agricultural activity or another since at least 1939," and (2) "there were no nonagricultural activities established adjacent to [Fresh Eggs'] property prior to 1939." Id. at Index No. 1.
 {¶ 5} Based in part on the two conclusions, the director considered Fresh Eggs' facility "to be exempt from the Ohio EPA's air pollution control regulations because its air contaminants are not regulated by Ohio's air pollution control laws set forth in ORC Chapter 3704." Id. Accordingly, he determined "there is no requirement for the company to obtain an air pollution control permit for its air contaminants, and there is no violation of ORC Chapter 3704 for failure to obtain a permit for the air contaminant sources." Id.
 {¶ 6} Bear appealed the director's dismissal to ERAC, contending the director unlawfully and unreasonably exempted Fresh Eggs from obtaining an air pollution control *Page 4 
permit under R.C. 3704.01(B). The parties stipulated to the relevant facts and agreed the sole issue on appeal was whether OEPA lawfully determined the case involved emissions from agricultural production activities that were established prior to adjacent nonagricultural activities, the second exemption criterion under R.C. 3704.01(B). To determine the issue, the parties submitted cross-motions for summary judgment.
 {¶ 7} Bear's motion challenged both the "substantive" and "procedural" bases of the director's determination. Bear substantively disputed OEPA's interpretation of the second exemption criterion under R.C.3704.01(B). He contended the change in the type of agricultural production activities conducted on Fresh Eggs' property, from "general farming" to "industrial agricultural production," significantly changed the amount and type of emissions from the property's agricultural production activities. In essence, Bear asserted that Fresh Eggs should not be exempted from Ohio's air pollution laws because the emissions from Fresh Eggs' egg production facility were established in 1996, nearly 30 years after Bear began to use his adjacent property for his family's nonagricultural residence.
 {¶ 8} By contrast, the cross-motion of the director and Fresh Eggs maintained Fresh Eggs did not lose its exemption status under R.C.3704.01(B) when the agricultural production activities shifted from crop production to poultry husbandry. Robert Hodanbosi, Chief of DAPC, explained by affidavit that "Ohio EPA makes no distinction between crops and livestock in making a determination on what constitutes an agricultural production activity." (Hodanbosi Affidavit, ¶ 10.) According to Hodanbosi, "once an agricultural activity is established on a parcel of property, air emissions from the agricultural activities on that *Page 5 
property are exempt from the regulation even if the type of agricultural activity changes over time." Id. at ¶ 17.
 {¶ 9} In support of their motion, the director and Fresh Eggs emphasized that ERAC twice upheld OEPA's interpretation. ConcernedCitizens of Central Ohio v. Jones (Jan. 16, 2001), ERAC Nos. 514120-514126 (dismissing an argument functionally equivalent to Bear's by concluding that "an agricultural use classification is not lost or destroyed when a property changes" from crop production to poultry husbandry); Concerned Citizens of Central Ohio v. Schregardus (June 7, 2001), ERAC Nos. 514078-514084 ("Concerned Citizens I") (dismissing an argument identical to Bear's by concluding "`agricultural production activities' do not lose their status as such simply because operations change from one of the activities defined in R.C. 929.01 to another").
 {¶ 10} Bear "procedurally" challenged OEPA's method for determining whether Fresh Eggs meets the second exemption criterion under R.C.3704.01(B). Bear contended that R.C. 3704.01(B) is based on policy standards of general and uniform operation, meaning OEPA was required to promulgate a rule in order to lawfully administer the statute. Bear argued that because a rule was necessary, OEPA in effect applied a "rule" not promulgated pursuant to R.C. Chapter 119 in dismissing his complaint under the statute.
 {¶ 11} In response to Bear's "procedural" challenge, the director and Fresh Eggs maintained OEPA's method for evaluating the second exemption criterion did not involve a policy standard of general and uniform operation, but rather OEPA's interpretation of the statute is based on the evidence the parties produced in each individual case. As Hodanbosi explained, "[i]n completing its analysis, Ohio EPA will look to the earliest *Page 6 
known agricultural use of the property in question and examine the surrounding property uses at that time." (Hodanbosi Affidavit, ¶ 10.)
 {¶ 12} The director and Fresh Eggs nonetheless asserted the director's examination of the properties' land use in 1939 was academic in this instance. Bear admitted his property, as well as Fresh Eggs' property, was used for agricultural production activities before he purchased and used his adjacent property for nonagricultural activities in 1967.
 {¶ 13} ERAC initially addressed Bear's "procedural" challenge. After noting R.C. 119.01(C)'s definition of "rule," ERAC cited this court's opinion in Concerned Citizens II, where we expressed "our reservation about the approach used to evaluate whether the agricultural production activities at issue were established prior to adjacent nonagricultural activities." Id. at 36. Although its observation did not resolve the merits of that appeal, this court suggested "the methodology for evaluating this criterion for exemption from regulation of agricultural emissions may warrant rulemaking by OEPA." Id.
 {¶ 14} Applying the suggestion from Concerned Citizens II to Bear's contentions, ERAC found the director's method for evaluating the second exemption criterion was unlawful absent a rule promulgated in accordance with R.C. Chapter 119. Because ERAC found the "procedural" issue dispositive to the appeal, it reversed and remanded the director's dismissal without addressing Bear's substantive challenge.
 {¶ 15} Fresh Eggs appeals, assigning two errors:
 1. The Environmental Review Appeals Commission erred by denying Ohio Fresh Eggs, LLC's motion for summary judgment and reversing the Director of the Ohio Environmental Protection Agency's dismissal of Robert Bear's Verified Complaint, which Complaint alleged Ohio Fresh *Page 7 
Eggs, LLC's egg-laying facility in Marseilles, Ohio was an "air contaminant" source subject to Ohio's air pollution permitting requirements, on the grounds that the Director's action was unlawful.
 2. The Environmental Review Appeals Commission erred by granting Robert Bear's motion for summary judgment and reversing the Director of the Ohio Environmental Protection Agency's dismissal of Robert Bear's Verified Complaint, on the grounds that the Director's action was unlawful and required rulemaking to establish guidelines for implementing the exclusion for emissions from certain "agricultural production activities" under R.C. 3704.01(B).
 {¶ 16} An appellate court shall affirm an ERAC order if it finds "the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 3745.06. "In the absence of such a finding," the court "shall reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law." Id. Because Fresh Eggs' second assignment of error more directly addresses the basis of ERAC's order, we address it first.
I. Second Assignment of Error {¶ 17} Fresh Eggs' second assignment of error broadly contends that, despite Concerned Citizens II, the director did not act unlawfully in dismissing Bear's complaint. In an effort to focus on the issues before ERAC, we initially note Bear's appeal to ERAC did not dispute OEPA's conclusion that Fresh Eggs' facility satisfied four of the five exemption criteria under R.C. 3704.01(B); Bear solely disputed OEPA's finding that Fresh Eggs satisfied the second exemption criterion. Although Bear challenged both the "substantive" and "procedural" bases for the finding, ERAC's order only addressed Bear's "procedural" challenge. The initial issue before this court therefore resolves to whether ERAC's order is *Page 8 
in accordance with law when it concluded the director's method of applying R.C. 3704.01(B) was unlawful.
 {¶ 18} ERAC's conclusion is premised on Concerned Citizens II, where the complainants argued in part that R.C. 3704.01(B) did not exempt Buckeye Egg's facility from Ohio's air pollution laws because "there were prior, adjacent nonagricultural activities disqualifying the facility from such an exemption." Id. at 35. Although this court declined to rule on the merits of the complainants' argument, we questioned OEPA's approach to determining whether Buckeye Egg's agricultural production activities were established prior to adjacent landowners' nonagricultural activities. Id. at 36. Our concern was directed specifically toward the director's method for choosing the year 1939 as the point in time to assess the land uses. Id. at 36-37. This court explained that without a uniform standard to evaluate the specific exemption criterion, the director could select a year "for the arbitrary reason that aerial photographs were taken in that year." Id. To remedy the matter, we suggested a rule promulgated under R.C. Chapter 119, so the application of the exemption criterion will not "depend on the whimsy of future directors or [a party] who can produce more compelling evidence from an arbitrary point in time." Id. at 37.
 {¶ 19} As in Concerned Citizens II, the director here cited the same 1939 aerial photograph to justify his finding that Fresh Eggs' agricultural production activities were established before Bear used his adjacent property for nonagricultural activities. Indeed, Fresh Eggs' appeal involves the same method and the same property at issue inConcerned Citizens II. Unlike Concerned Citizens II, however, the evidence presented to ERAC as part of the current appeal provided an independent basis, apart from the director's methodology, for finding Fresh Eggs' facility satisfied the second exemption *Page 9 
criterion under R.C. 3704.01(B): Bear readily admitted Fresh Eggs' property was used as "crop land" when he purchased his adjacent property in 1967 and was continually so used until Buckeye Egg changed the property's agricultural activity to large-scale egg production in 1996. (Bear Depo., 63-65.) Bear also admitted his property was used for crop production up to the time he purchased it. Id. at 59.
 {¶ 20} While this court may still harbor reservations about the director's approach to evaluating the second exemption criterion under R.C. 3704.01(B), the suggestion in Concerned Citizens II does not apply in light of Bear's admission: the director's method of ascertaining the pertinent data was irrelevant due to Bear's admission. The director thus did not act unlawfully pursuant to R.C. Chapter 119 or ConcernedCitizens II in dismissing Bear's verified complaint without a rule to guide him in applying the second exemption criterion. Accordingly, we sustain Fresh Eggs' second assignment of error to the extent indicated.
II. First Assignment of Error {¶ 21} Fresh Eggs' first assignment of error addresses Bear's substantive challenge to the director's dismissal. Although ERAC did not address the substantive issue, both parties spent a majority of their briefs analyzing the question inherent in Bear's substantive challenge: whether agricultural production activities were established prior to adjacent nonagricultural activities pursuant R.C. 3704.01(B) even when the emissions from the agricultural production activities changed significantly after the adjacent nonagricultural activities were established. The parties' in-depth analyses stem from repeated litigation over the same issue involving the same essential facts and the same *Page 10 
egg production facility in Concerned Citizens I, Concerned CitizensII, and the appeals from the director's and ERAC's orders in this case.
 {¶ 22} We could remand this case to ERAC to address Bear's substantive argument, but to do so would be to elevate form over substance. Because ERAC in Concerned Citizens I recently addressed and rejected the same argument with regard to the same property, a remand to ERAC to reiterate its position here seems not only unnecessary, but meaningless. Instead, because both parties fully briefed the court on this issue, and we have ERAC's actual ruling on these facts, we will determine whether ERAC's interpretation of the statute, as expressed in earlier phases of this litigation, is in accordance with law. See Tube City Olympic of Ohio,Inc. v. Jones, Franklin App. No. 03AP-295, 2004-Ohio-1464, ¶ 26.
 {¶ 23} In interpreting statutes, courts are required to give due deference to an agency's administrative interpretation where the agency has accumulated substantial expertise and the legislature has delegated to the agency the responsibility of implementing the congressional command. North Sanitary Landfill, Inc. v. Nichols (1984),14 Ohio App.3d 331, 337, citing Jones Metal Products Co. v. Walker (1972),29 Ohio St.2d 173, 181. If, however, such interpretation is repugnant to the statute, rule, or section, courts should not accept it. Id., citingAnderson Bros. Ford v. Valencia (1981), 452 U.S. 205, 219.
 {¶ 24} As pertinent here, R.C. 3704.01(B) provides that "air contaminant" does not include "emissions from agricultural production activities," as defined in R.C. 929.01, that (1) "are consistent with generally accepted agricultural practices," (2) "were established prior to adjacent nonagricultural activities," (3) "have no substantial, adverse effect on the *Page 11 
public health, safety, or welfare," (4) "do not result from the negligent or other improper operations of any such agricultural activities," and (5) "would not be required to obtain a Title V permit." If an emission is not classified as an air contaminant under R.C.3704.01(B), Ohio's air pollution control laws set forth in R.C. Chapter 3704 do not regulate it. R.C. 3704.05.
 {¶ 25} In Concerned Citizens I, Don Waltermeyer, like Hodanbosi in this case, testified before ERAC that OEPA makes no distinction between crops and livestock in determining what constitutes an agricultural production activity. Id. at Findings of Fact ¶ 28. Waltermeyer explained that so interpreting the statute allows a farmer to choose how best to utilize his or her land, even changing its use from crop production to housing livestock, without risking the loss of its designation as an agricultural production activity and its qualification for exemption under the air pollution regulations. Id. The director in ConcernedCitizens I, like the director here, construed the second exemption criterion under R.C. 3704.01(B) to mean that once a parcel of land has established agricultural activities, air emissions from the agricultural activities are exempt from regulation even if the type of agricultural activity changes over time.
 {¶ 26} The complainants in Concerned Citizens I, including Bear, argued, as did Bear here, that the emissions from agricultural production activities, not the agricultural production activities themselves, must be established prior to adjacent nonagricultural activities for the exemption to apply. Applied specifically to their circumstances, the complainants asserted the exemption does not apply to the egg production activity because their adjacent property was used for nonagricultural activities some time before Buckeye Egg purchased the property and changed its operations, and thus its emissions, *Page 12 
from crop production to poultry husbandry. Id. The complainants maintained the relevant point in time for purposes of the second exemption criterion should be when the type and amount of emissions change. Id.
 {¶ 27} In discussing the parties' respective contentions, ERAC initially observed that it addressed and rejected the same arguments inConcerned Citizens I. It generally explained that emissions from agricultural production activities are exempt from the definition of "air contaminant" under R.C. 3704.01(B); as such, they are not subject to the OEPA permitting process even if the type of emissions changes over time, so long as the activity is properly defined as an agricultural production activity. Id. at Conclusions of Law, ¶ 11. ERAC then defined the core issue as "whether or not operations on the egg farm property lost their status as an agricultural production activity at the point in time when crop production ceased and poultry husbandry commenced." Id. at ¶ 12.
 {¶ 28} ERAC noted R.C. 929.01 incorporates a number of activities, including crop production and poultry husbandry, in its definition of "agricultural production." As ERAC explained, "[n]othing in R.C. 929.01
or R.C. 3704.01(B) suggests that the application of R.C. 3704.01 should change if the type of activity outlined in R.C. 929.01 changes. To the contrary, R.C. 929.01 uses the term `agricultural activities' in the plural, referring to a list of possible activities, all of which are encompassed by the term." Id.
 {¶ 29} ERAC concluded "that for purposes of R.C. 3704.01, `agricultural production activities' do not lose their status as such simply because operations change from one of the activities defined in R.C. 929.01 to another." It further clarified that "changing the use of the land at issue herein from crop production to poultry operation did not destroy the applicability of the agricultural exemption for [the egg production] facility. * * * [T]he *Page 13 
relevant point in time for determining whether or not an agricultural activity was established `prior to adjacent nonagricultural activities' is at the time when agricultural activity, of whatever type, was first established." Id. at ¶ 12.
 {¶ 30} Because the statute is susceptible of two differing interpretations, we are constrained to defer to ERAC's interpretation. R.C. 3704.01(B) exempts "emissions from agricultural production activities" from the definition of "air contaminants" if the "emissions from agricultural production activities" meet five specified criteria. The ambiguity in the statute arises from the phrase "emissions from agricultural production activities." The five criteria subsequently set forth in the statute could modify either "emissions" or "agricultural production activities," and the statute does not indicate which one the five criteria are intended to modify.
 {¶ 31} The success of Bear's substantive challenge is contingent on the five criteria modifying "emissions," so that Fresh Eggs satisfies the second exemption criterion under R.C. 3704.01(B) only if its emissions were established prior to adjacent nonagricultural activities. According to ERAC, the five criteria modify "agricultural production activities," meaning Fresh Eggs satisfies the second exemption criterion under R.C. 3704.01(B) if any agricultural production activities were established prior to adjacent nonagricultural activities. Although Bear's interpretation seems reasonable and consistent with the statute's wording, the same can be said for ERAC's interpretation.
 {¶ 32} In the final analysis, each of the five exemption criteria can modify either "emissions" or "agricultural production activities" and still logically correspond with the statute's wording. "[W]here an ambiguous statute is subject to an administrative history of interpretation, this court may defer to the administrative construction of the statute, unless *Page 14 
the interpretation is clearly in error." State ex rel. Taylor v. Indus.Comm., Franklin App. No. 05AP-803, 2006-Ohio-4781, ¶ 10, quoting In reAultman Hosp. (1992), 80 Ohio App.3d 134, 139. Because ERAC's interpretation is neither repugnant to the statute nor clearly in error, we defer to ERAC's interpretation as being in accordance with law.
 {¶ 33} Bear nevertheless points out that ERAC goes to great lengths to support its conclusion, but in effect ignores the word "emissions" from its interpretation of R.C. 3704.01(B). Contrary to Bear's contentions, ERAC's interpretation does not ignore the word "emissions," but rather concludes that if the agricultural production activities satisfy the second exemption criterion, then the emissions from those agricultural production activities are excluded from the definition of air contaminant even if the agricultural production activities change after adjacent nonagricultural activities were established. ERAC thus gives meaning to each word in the phrase "emissions from agricultural production activities." Because ERAC's interpretation of R.C. 3704.01(B) is in accordance with law, we sustain Fresh Eggs' second assignment of error to the extent indicated.
 {¶ 34} Having sustained Fresh Eggs' assignments of error to the extent indicated, we vacate ERAC's order reversing the director's decision and reinstate the director's decision.
Judgment reversed.
KLATT, J., concurs. SADLER, P.J., concurs in part and dissents in part.