## In re SILVER STATE HELICOPTERS, LLC, Debtor.

### AICCO, Inc., Plaintiff,

v.

James F. Lisowski, Sr., as Trustee for Silver State Helicopters, LLC and Orix Finance Corporation, Defendants.

### Orix Finance Corporation, Counterclaimant,

v.

James F. Lisowski, Sr., as Trustee for Silver State Helicopters, LLC and Orix Finance Corporation, Counterdefendants.

Bankruptcy No. 08–10936–MKN.
Adversary No. 08–1149.

United States Bankruptcy Court, D. Nevada.

March 27, 2009.

---

Jeanette E. McPherson, Las Vegas, NV, for Debtor.James Patrick Shea, Las Vegas, NV, Steven J. Reisman, New York, NY, for Plaintiff.

Anthony A. Zmaila, Victoria L. Nelson, Las Vegas, NV, for Defendants.

Matthew C. Zirzow, Gordon & Silver, Ltd., Lee I. Iglody, William M. Noall, Las Vegas, NV, for Counterclaimant.

## MEMORANDUM DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MIKE K. NAKAGAWA, Bankruptcy Judge.

Plaintiff's Motion for Summary Judgment was heard on December 11, 2008.

The appearances of counsel were noted on the record.

## BACKGROUND[1]

AICCO, Inc. ("AICCO") makes loans to businesses to enable them to purchase business insurance. This is known as insurance premium financing. Silver State Helicopters, LLC ("SSH" or "Debtor") used insurance premium financing provided by AICCO to purchase insurance coverage to operate helicopter flight instruction schools. To memorialize the financing transactions, SSH executed two insurance premium financing agreements ("PFAs") under which it became obligated to repay the loan and finance charges in amortized monthly installments. The first agreement was dated June 26, 2007, in the amount of $854,281.47 ("PFA–1"), and the second agreement was dated December 12, 2007, in the amount of $3,872,314 ("PFA–2").

As security for repayment, SSH assigned to AICCO its rights in the underlying insurance policies including, among other things, all "returned" premiums on the insurance policies (collectively "unearned premiums"). In the event an insurance policy is cancelled, the insurer typically is required to return to the insured the balance of any unearned premiums.

SSH and Orix Finance Corporation ("Orix") entered into a certain Credit Agreement ("Credit Agreement") dated August 15, 2007, by which Orix extended a $40 million revolving credit facility to SSH. Obligations under the Credit Agreement were secured by substantially all of SSH's personal property under a Guarantee and Collateral Agreement ("GCA") of the same date. The GCA provided to Orix a security interest in, amongst other things, "all General Intangibles" that are defined to include all "insurance rights and refund claims and rights and claims to unearned premiums with respect to such insurance." Orix filed UCC–1 financing statements on August 15, 2007 and August 16, 2007, in Nevada, Delaware and Washington.

On February 4, 2008, SSH filed a voluntary petition under Chapter 7 of the Bankruptcy Code. James F. Lisowski, Sr. was appointed as the bankruptcy trustee ("Trustee") to administer the case. On February 12, 2008, AICCO filed an Emergency Motion for Relief from the Automatic Stay and for Adequate Protection so it could cancel the subject policies due to a default in the payments due under the PFAs. Orix opposed, asserting that it has an interest in the unearned premiums superior to that of AICCO. On February 29, 2008, an order was entered ("RAS Order") allowing AICCO to terminate both PFAs, and further ordered the unearned premiums to be recovered by the Trustee and held in an interest-bearing account pending further order resolving the priority dispute between the parties.

On April 30, 2008, AICCO commenced an adversary proceeding naming Orix and the Trustee as defendants. The complaint seeks a declaration that AICCO has first priority in the unearned premiums, a declaration that AICCO has a valid claim in the amount of $3,982,896.08, and an order that all unearned premiums should be

---

1. In the text and footnotes of this Memorandum Decision, all references to "Section" shall be to provisions of the Bankruptcy Code appearing in Title 11 of the United States Code unless otherwise indicated. All references to "NRS" shall be to the Nevada Revised Statutes unless otherwise indicated. All references to "Bankruptcy Rule" shall be to provisions of the Federal Rules of Bankruptcy Procedure unless otherwise indicated. All references to "FRCP" shall be to the Federal Rules of Civil Procedure unless otherwise indicated.

turned over to AICCO. On May 30, 2008, the Trustee and Orix filed separate answers to the complaint. Orix's answer includes a single counterclaim and crossclaim seeking a declaration that Orix has first priority in the unearned premiums. AICCO and the Trustee filed answers to the counterclaim and the crossclaim.

On June 25, 2008, AICCO filed a Motion for Summary Judgment ("SJ Motion")[2] as against both Orix and the Trustee. Orix filed opposition ("Orix Opposition") and the Trustee filed an opposition that essentially adopts the arguments presented by Orix[3]. AICCO filed a reply brief ("AICCO Reply"). AICCO claims to have perfected a security interest in the Debtor's right to the insurance premium refunds under PFA–1 as of June 26, 2007, and to the insurance premium refunds under PFA–2 as of December 12, 2007. Orix asserts a perfected security interest in all tangible and intangible assets of the Debtor as of August 15, 2007, and thereafter acquired, including refunds of unearned insurance premiums. At issue is whether AICCO has perfected its security interest in the Debtor's right to insurance premium refunds, and if so, whether that interest is superior to the security interest asserted by Orix.

The SJ Motion initially was heard on September 3, 2008. At a further hearing on October 3, 2008, the court ordered additional simultaneous briefing on: (1) the requirements under common law for the perfection of interests in unearned insurance premiums and (2) the priority rules under common law for competing interests in unearned insurance premiums. AICCO and Orix each filed supplemental and closing briefs on the additional issues. ("AICCO Supplement", "AICCO Closing"[4], "Orix Supplement" and "Orix Closing") Final oral arguments were presented on December 11, 2008, and the matter was taken under submission.[5]

## APPLICABLE LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure is applicable in adversary proceedings pursuant to Bankruptcy Rule 7056. *See In re Silva,* 190 B.R. 889, 891 (9th Cir.BAP1995). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). A fact is "material" for summary judgment purposes if it might affect the outcome of suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party cannot rest upon mere denials or allegations in pleadings, but must set forth specific facts, by affidavit or otherwise, sufficient to raise a

---

**2.** The SJ Motion is accompanied by an Affidavit of Lisa R. Chandler in Support of Motion for Summary Judgement ("First Chandler Affidavit").

**3.** The Trustee also joined in the other briefs filed by Orix thereafter.

**4.** The AICCO Closing brief is accompanied by the First Supplemental Affidavit of Lisa R. Chandler in Support of AICCO's Motion for Summary Judgment ("Supplemental Chandler Affidavit").

**5.** Both AICCO and the Trustee have requested that the court certify to the Nevada Supreme Court the questions raised by the parties. *See, e.g., American Sports Radio Network v. Krause (Matter of Krause),* 546 F.3d 1070 (9th Cir.2008)(certifying question involving effect of revocation of Nevada corporate charter). The court has considered the request but has concluded that certification is not warranted.

genuine issue of fact for trial. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the judge is also ultimate trier of fact, and when trial would not enhance the bankruptcy court's ability to draw inferences and conclusions from undisputed facts, then the court is free to draw such inferences and conclusions within the context of a motion for summary judgment. *See Lanting v. Lanting (Matter of Lanting)*, 198 B.R. 817, 821 (Bkrtcy.N.D.Ala. 1996).

## DISCUSSION[6]

■ Paragraph 8 of both PFAs grants an assignment of the unearned premiums as follows:

> **Security.** To secure payment of all amounts due under this Agreement, Insured **assigns LENDER** a security interest in all right, title and interest to the Policy, including (but only to the extent permitted by applicable law): (a) all money that is or may be due the Insured because of a loss under the Policy that reduces the unearned premiums (subject to the interest of any applicable mortgagee or loss payee), (b) **any return of the premium for the Policy,** and (c) dividends which may become due Insured in connection with the Policy. (Emphasis added.)

*See* Exhibits "1" and "2" to SJ Motion.[7]

Paragraph 3 of both PFAs provide for the cancellation of the insurance policies as follows:

> **Cancellation. After the occurrence of a default in the payment** of any money due the Lender or a default consisting of a transfer to a third party of any of the schedule policies, **LENDER may request cancellation of the insurance policies** listed in the schedule upon expiration of 10 days written notice of intent to cancel (13 days in Utah, 15 days in Idaho), **provided said default is not cured within such period, and LENDER may proceed to collect the entire unpaid balance due hereunder or any part thereof by appropriate legal proceedings.** If any default results in a cancellation of the Policy, Insured agrees to pay a cancellation charge in accordance with applicable law (not applicable in NV). (Emphasis added.)

*Id.*

The face page of both PFAs includes a paragraph addressed to the agent or broker providing that "Upon cancellation of any of the scheduled Policies, the undersigned Agent or Broker agrees upon demand to pay to LENDER or its assigns their **commission on any unearned premiums** applicable to the cancelled Policies." (Emphasis added.)[8]

Pursuant to the RAS Order, the Trustee was permitted to cancel the insurance policies encompassed by both PFAs *nunc pro tunc* to February 11, 2008, and to recover any unearned premiums. The Trustee was directed to hold the unearned premiums.

Section 686A of the Nevada Revised Statutes ("NRS") addresses the financing of insurance premiums in Nevada. An "agreement" governed by NRS 686A

---

6. Citations to the written arguments submitted by parties will refer to the page number and then line number, separated by a colon, e.g., 4:10–15 would refer to page 4, line 10 through line 15 of the document.

7. Both exhibits are properly authenticated. *See* Chandler Affidavit at ¶ 3.

8. This language does not separate the broker's commissions on the premiums paid by the insured from the premiums themselves. Thus, AICCO's interest in the unearned premiums includes the commissions that the broker would retain from the same payments.

means "a contract between a person and an insured or prospective insured under which the person agrees to pay a premium in advance on behalf of the insured in exchange for repayment of the amount advanced with interest or for some other consideration." NRS 686A.330(1). Additionally, a "company" is defined as a "person engaged in the business of entering into agreements or purchasing agreements. The term does not include a person who finances a premium in connection with the sale of a motor vehicle upon which he holds a lien." NRS 686A.330(2). Both PFA–1 and PFA–2 are agreements encompassed by NRS 686A and AICCO also is a company as defined by NRS 686A. In contrast, it does not appear that Orix is a company as defined by NRS 686A.330(2).

NRS 686A.460 is titled "Cancellation of insurance policy by company." It provides in pertinent part as follows:

1. **When an agreement contains a power of attorney enabling the company, in the name of the insured, to cancel any insurance policy listed in the agreement,** the insurance policy must not be cancelled by the company unless it is cancelled in accordance with this section.

2. A company shall mail written notice of its intent to cancel an insurance policy because of a default in payment under an agreement to the insured at his last known address as indicated in the records of the company and to the agent who submitted the agreement at least 10 days before cancellation. If the default is cured within this 10–day period, the company shall not cancel the insurance policy.

3. If the default is not cured within the 10–day period, the company may cancel the policy if it mails to the insured at his last known address as indicated in the records of the company and to the insurer a notice of cancellation which must include the effective date of the cancellation. The policy must be cancelled as it the notice of cancellation had been submitted by the insured, but without requiring the return of the policy.

(Emphasis added.)

NRS 686A.470 is titled "Return of unearned premium." It provides as follows:

1. When an insurance policy is **cancelled pursuant to NRS 686A.460,** the insurer **shall return the unearned premium to the company** for credit to the account of the insured. The premium must be mailed to the company:

(a) Within 45 days after receipt of the notice of cancellation; or

(b) Immediately following an audit performed to determine the amount of the premium. If such an audit is performed, it must be completed within 60 days after receipt of the notice of cancellation.

2. If the returned portion of the premium exceeds the insured's obligation to the company, the company shall pay the excess to the insured within 30 days after receipt, except that no refund is required if the excess is less than $1.

3. If the returned portion of the premium is less than the insured's obligation to the company, the company shall notify the insured within 15 days making a demand for payment, except that the company shall not make a demand for payment if the obligation is less than $1.

4. The company shall notify the agent who submitted the agreement of any refund paid directly to the insured pursuant to subsection 2 at the time the refund is paid. Within 15 days after

receipt of this notice, the agent shall refund to the insured any unearned commissions which are owed to the insured as a result of the cancellation.

5. The company shall notify the agent who submitted the agreement of any deficiency. Within 30 days after receipt of the notice, the agent shall refund to the insured any unearned commissions which are owed to the insured as a result of the cancellation.

(Emphasis added.)

Both PFAs include a provision whereby AICCO is appointed as "Attorney-in-fact" for SSH "with full authority, in the event of default, to (I) cancel the said policies in accordance with the provisions herein, (II) receive all sums assigned to LENDER ..." It therefore appears that the PFAs are agreements encompassed by NRS 686A.460 and the cancellation of the policies pursuant to the RAS Order was not inconsistent with NRS 686A.470.

 While NRS 686A addresses the financing of insurance premiums, it does not discuss the manner in which a company perfects its interest in an unearned insurance premium nor does it dictate the method by which priority disputes are to be resolved.[9] Unlike statutes in other states[10], NRS 686A simply requires that unearned insurance premiums be refunded to the insurance premium financing company but does not have provisions addressing perfection of the company's interest or the priority of competing claims.[11] Absent an express statutory provision addressing these issues, this court looks to common law to determine if filing of a notice or a similar act is required for the company to perfect its interest in an unearned insurance premium and whether the company's interest takes priority over other parties.

## I. Insurance Premium Financing and Relevant Case Law.

Both parties agree that Article 9 of the Uniform Commercial Code ("UCC") does not apply to insurance premium financing agreements. See SJ Motion at 11:9–23,

---

9. NRS 686A.330 through 686A.520 directly deal with insurance premium financing. NRS 686A.520 incorporates by reference NRS 686A.010 through 686A.310, as well as NRS 683A.341, NRS 683A341, NRS 683A.451, NRS 683A.461 and NRS 683A.480. None of these provisions, however, address the perfection or priority issues.

10. For example, California has a statute that reads, "No filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction as against creditors, subsequent purchasers, pledgees, encumbrances, successors or assigns of the insured." Cal Fin Code § 18591 (2008). Similarly, Maryland has an almost identical statute providing that "Filing of a premium finance agreement is not needed to perfect the validity of a premium finance agreement as a secured transaction as against creditors, subsequent purchasers, pledgees, encumbrancers, trustees in bankruptcy or any other insolvency proceeding under any law, or anyone having the status or power of any of those persons, their successors, or assigns." Md.Code Ins. § 23–310 (1997).

11. The maxim expressio unius est exclusio alterius is an uncertain guide for interpreting statutes. See Illinois Dep't of Public Aid v. Schweiker, 707 F.2d 273, 277 (7th Cir.1983), citing Herman & MacLean v. Huddleston, 459 U.S. 375, 386, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). "In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. An inference drawn from legislative silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." Burns v. United States, 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991). In other words, "not every silence is pregnant." See Illinois Dep't of Public Aid v. Schweiker, supra, 707 F.2d at 277.

*citing,* inter alia, NRS 104.9109(4)(h); *In re Anchorage Nautical Tours, Inc.,* 102 B.R. 741, 744 (9th Cir. BAP 1989); *TIFCO, Inc. v. United States Repeating Arms Co. (In re U.S. Repeating Arms Co.),* 67 B.R. 990, 997–98 (Bkrtcy.D.Conn.1986). *See also* Orix Opposition at 5:10. No Nevada cases have been cited that are determinative of how interests in unearned insurance premiums are perfected or how priority disputes are decided between parties asserting claims to the same unearned premiums. The court therefore looks for guidance from the case law of other jurisdictions, most of which have been cited by the parties in their legal memoranda.

In *U.S. Repeating Arms,* the bankruptcy court granted relief from stay in a Chapter 11 proceeding in favor of Tifco, Inc., an insurance premium financier. Prior to the commencement of the case, the debtor had obtained insurance coverage through a broker. Tifco financed the debtor's purchase of nine separate insurance policies, agreeing to repay the loaned amount in eight equal monthly installments. Prior to the commencement of the case, the debtor also borrowed additional sums from Tifco for premium payments directly to an insurance carrier, agreeing to repay the additional sums in five equal monthly installments. To carry out these lending transactions, Tifco and the debtor entered into premium financing agreements whereby the debtor assigned to Tifco its interest in any unearned or returned premiums and also appointed Tifco its attorney-in-fact to cancel any of the financed insurance policies in the event of default in the monthly payments. The insurance broker also was a party to both premium finance agreements.

Several years prior to the debtor's entry into the premium financing agreements, it had entered into a "Security and Loan Agreement" with Manufacturers Hanover Commercial Corporation ("MHCC"). Under that agreement, the debtor granted to MHCC a continuing assignment and security interest in all existing and future contracts, general intangibles and insurance policies, and all cash and noncash proceeds. Additionally, MHCC filed UCC–1 financing statements in both Connecticut and Massachusetts.

After the debtor filed its Chapter 11 petition, it made no further monthly installment payments under the premium financing agreements. Tifco then brought a motion seeking relief from stay to enforce its rights to the unearned premiums under the premium financing agreements. While the motion was pending, the debtor deposited $81,000 into escrow pending a determination of whether Tifco had an enforceable lien against the unearned premiums.[12] The debtor, MHCC and the creditors committee appointed in the case challenged the validity of Tifco's claim to a valid, perfected and enforceable lien in the unearned premiums.

The bankruptcy court concluded that Tifco had received a valid security interest in the unearned premiums when it paid the premiums required by the policies and had obtained an effective assignment of the right to any unearned premiums. 67 B.R. at 995. It further concluded that an interest in unearned insurance premiums is excepted from Article 9 of the UCC and a filing of notice of the assignment of the debtor's right to the unearned premiums

**12.** As of the bankruptcy petition date, the value of the unearned premiums exceeded the amount still owed to Tifco by $114,105.48. The $81,000 deposited into escrow by the debtor was a proposed amount of an adequate protection payment in the event Tifco was determined to have a valid lien. 67 B.R. at 999 and n. 14.

therefore was not required. 67 B.R. at 996–97.[13]

As between Tifco and MHCC, the bankruptcy court concluded that their respective liens were not of the same nature. Thus, even though MHCC had filed its UCC–1 financing statement before the premium financing agreements had been entered into by the debtor, a "first in time, first in right" priority rule could not be followed. 67 B.R. at 997. Instead, the court analogized Tifco's lien to be a purchase money security interest because Tifco had expressly given specific value that enabled the debtor to acquire the insurance coverage. *Id.* at 997–98, *citing Anderson Brothers Ford v. Valencia,* 452 U.S. 205, 215, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981).[14] Characterizing purchase money security interests as "a type of interest long given priority over liens attaching through 'after-acquired property' clauses", 67 B.R. at 997–98 [15], the court in

*U.S. Repeating Arms* concluded that Tifco's perfected lien in the unearned insurance premiums had priority over the lien asserted by MHCC. 67 B.R. at 998. Because of that priority, the court granted relief from stay to Tifco, ordering that the $81,000 be released from escrow and that the debtor provide an offer of adequate protection with respect to Tifco's lien position as of the petition date. 67 B.R. at 1000.

*U.S. Repeating Arms* was discussed in *In re Uly–Pak, Inc.,* 101 B.R. 551 (Bkrtcy. S.D.Ill.1989). A voluntary Chapter 11 proceeding was commenced by the debtor who previously had purchased certain insurance policies through a broker, Consolidated Insurance Agency, Inc. ("Consolidated"). To purchase the policies, the debtor had executed a "retail installment contract" in favor of Consolidated under which the debtor would make a downpayment and nine subsequent monthly payments to

13. Although the *U.S. Repeating Arms* case was commenced in Connecticut, the parties had agreed and the court concluded that under the applicable choice of law rules, the insurance premium financing agreements had become operative in the State of Maryland and that Maryland law was applicable. 67 B.R. at 994. Thus, the UCC as adopted in Maryland was applied by the court.

14. In *Anderson Brothers,* a car dealer sold a vehicle to the plaintiffs. The standard retail installment contract gave the dealer a security interest in the car. The back of the contract included a provision requiring the buyer to maintain property damage insurance on the vehicle and also included a provision assigning to the dealer any moneys payable on the insurance, including any returned or unearned premiums. It also provided that the proceeds of the insurance, including any unearned premiums, would be applied towards replacing the vehicle or payment on the balance of the contract. Within approximately one month of the purchase, the buyers returned the car and sued the dealer alleging that the assignment of the insurance proceeds and unearned premiums was not adequately

disclosed and violated the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq. The Court concluded that the assignment of unearned property damage insurance premiums did not create a security interest for which disclosure was required by TILA. In reaching that conclusion, the Court quoted from language in Regulation "Z" under TILA, promulgated by the Federal Reserve Board. Regulation "Z" noted a distinction between interests that are essential to an automobile sales transaction and those that are not: the primary interest is in the automobile and the incidental interest is in the insurance proceeds. It contrasted that with an insurance premium financing transaction where the primary interest in the insurance policy "is just like a purchase money security interest and would be disclosed as a security interest." 46 Fed.Reg. 20853 (1981).

15. For this proposition, the court cited 1B Coogan, Hogan, Vagts, Secured Transactions Under the Uniform Commercial Code, § 19.01 at 19–3–4 (1986) and White & Summers, Uniform Commercial Code § 25–5 at 1043 (2d ed.1980).

Consolidated for the insurance policies. The contract also stated that Consolidated as seller would have a security interest in the property sold and also that Consolidated would have a purchase money interest in the "goods" under the UCC for the State of Illinois until all payments were made by the buyer. Consolidated then assigned the retail installment agreement to the Bank of Carbondale.

One of the policies purchased pursuant to the retail installment contract was a liability policy for which the debtor was determined to owe a recalculated premium after the policy already had expired. To pay that recalculated premium, the debtor entered into a purchase finance contract with Consolidated and First National Bank. The purchase finance contract assigned to Consolidated all of the debtor's rights to unearned premiums under the liability policy in the event of a default and also gave Consolidated a power of attorney to cancel the policy and to receive the unearned premiums in the event of a default. After the debtor subsequently commenced its Chapter 11 proceeding, it filed an adversary complaint to prevent Consolidated from terminating the insurance policies. In turn, Consolidated sought relief from stay to terminate the insurance policies and to apply the unearned premiums. The court therefore had to determine whether Consolidated had enforceable liens against the unearned premiums based on the retail installment contract and the purchase finance contract.

The court in *Uly–Pak* first determined that the transactions were not governed by Article 9 of the UCC by virtue of UCC § 9–104(g). 101 B.R. at 553, *citing U.S. Repeating Arms*. The statute governing premium finance companies in Illinois also did not address the requirements for obtaining a security interest in unearned premiums and there was no case law in Illi-

nois relevant to the issue. 101 B.R. at 554. The court therefore looked to cases from other states, such as *U.S. Repeating Arms*, for guidance. Based on its review of the case law, the court concluded that an insurance premium financier must have both an effective assignment of the insured's right to the unearned premiums and a right to cancel the insurance policies in the event of repayment. *Id., citing U.S. Repeating Arms, In re RBS Industries,* 67 B.R. 946 (Bkrtcy.D.Conn.1986), *Matter of Redfeather Fast Freight,* 1 B.R. 446 (Bkrtcy.D.Neb.1979), *Matter of Maplewood Poultry Co.,* 2 B.R. 550 (Bkrtcy. D.Me.1980), and *Premium Financing Specialists, Inc. v. Lindsey,* 11 B.R. 135 (E.D.Ark.1981).

As applied to the retail installment contract, the *Uly–Pak* court found that it did not contain language sufficient for an effective assignment under common law. Moreover, even if it did, the retail installment contract did not give Consolidated authority to cancel the debtor's insurance policies and to recover the unearned premiums. 101 B.R. at 554–555. As to the premium finance contract, the court concluded that it met the requirements for a valid security interest because it assigned the unearned premiums from the liability policy to Consolidated and gave Consolidated an irrevocable power of attorney to cancel the policy. Because the liability policy had already expired when the premium finance contract was executed, however, the court also concluded that there were no unearned premiums remaining on the policy. 101 B.R. at 555. The *Uly–Pak* court therefore entered an injunction in the adversary proceeding barring Consolidated from terminating the debtor's insurance policies and denied Consolidated's motion for relief from stay.

*U.S. Repeating Arms* also was cited with approval by the court in *In re Big*

*Squaw Mountain Corporation,* 122 B.R. 831 (Bkrtcy.D.Me.1990). In the latter case, an involuntary Chapter 7 proceeding was commenced against the debtor. Prior to the case, the debtor had entered into a premium financing agreement with A–1 Credit Corporation ("A–1"). Under the agreement, the debtor borrowed funds from A–1 to pay the premiums on insurance policies issued in favor of the debtor. The debtor also assigned to A–1 all of its interest in any unearned premiums and also gave A–1 a power of attorney to cancel the insurance policy in the event of a default in the repayment of the loan. After it was executed by the parties, A–1 retained possession of the premium financing agreement but not the insurance policies. 122 B.R. at 833 n. 10.

Prior to the commencement of the involuntary proceeding, the debtor had defaulted in the final payment on A1's loan. After the involuntary bankruptcy was commenced, the insurance policy was "validly cancelled" by A–1 [16] and the unearned premiums were returned by the insurer to the debtor's broker. The broker then turned the funds over to the bankruptcy trustee. The parties agreed that the premium financing agreement created a lien in favor of A–1 with respect to the unearned premiums. A–1 then commenced an adversary proceeding against the debtor and the trustee to determine that its lien was superior to any interest in the unearned premiums that could be claimed by the bankruptcy estate. 122 B.R. at 833–34.

The *Big Squaw Mountain* court first determined that because the bankruptcy trustee was asserting rights of a judicial lien creditor under the strong arm clause,

*see* 11 U.S.C. section 544, state law would determine his rights against competing interest holders. The parties in the adversary proceeding agreed that the law of the State of Maine would apply. 122 B.R. at 834–35. Like the State of Maryland, the State of Maine had adopted the same provision of the UCC, i.e., UCC § 9–104(g), that excluded its applicability to secured transactions involving insurance policies. Based on *U.S. Repeating Arms* and other authorities, the court concluded that A–1's priority rights as against the bankruptcy trustee would be determined under common law rather than Article 9 of the UCC. 122 B.R. at 836.

The court noted instances under Maine law where filing of a notice or possession of the collateral by the secured party was required, 122 B.R. at 837, in order to prevent a third party, such as a judicial lien creditor, from asserting a superior interest. *Id.* The court then observed that Maine had no statute regulating "the manner in which assignments of unearned insurance premiums pursuant to premium financing agreements must be perfected, if at all." 122 B.R. at 838. Drawing from case law in other jurisdictions, the court observed that "neither recordation of the premium financing agreement or taking possession or the underlying policy is required to perfect the insurance premium assignee's interest." *Id.* It noted one decision where the court concluded that "assignment of an interest in unearned premiums would be valid against third parties if the assignee could demonstrate that notice had been given to the party obligated to make the refund, i.e., the insurer." *Id.,* citing *In re Expressco, Inc.,* 99 B.R. 395

---

**16.** The bankruptcy trustee in the involuntary case had stipulated that the cancellation was valid even though A–1 had not obtained relief from stay to do so. Based on the stipulation, the court treated the cancellation as valid, rather than being void in violation of the automatic stay. 122 B.R. at 833 n. 6.

(Bkrtcy.M.D.Tenn.1989) [17]. It noted another decision where the court recognized "an equitable lien in favor of the financing entity for the amount of its advances and that, in the absence of law requiring it, the assignment [under a premium financing agreement] was good against third parties without filing or delivery of the policy." *Id., citing Premium Financing Specialists v. Lindsey,* 11 B.R. 135 (E.D.Ark.1981). Drawing upon these authorities, the court in *Big Squaw Mountain* held that A–1's possession of the premium financing agreement and its notification to the insurance carriers was sufficient as against subsequent encumbrancers, including the bankruptcy trustee. 122 B.R. at 838–39.

*Big Squaw Mountain* was mentioned by the court in *American Bank and Trust Company v. Jardine Insurance Services Texas, Inc. (In re Barton Industries, Inc.),* 104 F.3d 1241 (10th Cir.1997). In that case, the Chapter 11 debtor had an existing credit agreement with American Bank and Trust Company ("ABT") that granted ABT a security interest in all intangible assets. Under the credit agreement, ABT loaned funds to the debtor for a downpayment on casualty insurance policies issued by various carriers. The debtor then entered into a premium financing agreement with Transamerica Insurance Finance Corporation ("TIFCO") to borrow the remaining funds to purchase the casualty policies. Under the premium financing agreement, the debtor assigned to TIFCO any and all unearned premiums. Payment for the policies was made through the debtor's insurance agent, Jardine Insurance Services ("Jardine"). The funds borrowed from ABT for the downpayment were paid to TIFCO. After the premium financing agreement was entered and after the downpayment was borrowed, ABT and the debtor amended the credit agreement to specify that ABT had a security interest in unearned insurance premiums. Shortly thereafter, the debtor (Barton Industries) filed a voluntary Chapter 11 petition and then cancelled the insurance policies.

Upon cancellation, the insurers returned the unearned premiums to the agent, Jardine, who then remitted them, apparently less a commission, to TIFCO. Sometime thereafter, the debtor's Chapter 11 plan was confirmed. ABT claimed that the confirmed plan conveyed to ABT all of the unearned premiums or provided ABT a security interest ahead of TIFCO. ABT therefore commenced an adversary proceeding against Jardine and TIFCO for the unearned premiums. The bankruptcy court, however, held that TIFCO and Jardine had not been given meaningful notice that the Chapter 11 plan would affect the security interest provided by the premium financing agreement. Because such notice had not been given, confirmation of the Barton Industries plan did not alter the parties' respective interests in the unearned premiums. 104 F.3d at 1245–46. The bankruptcy court then determined that ABT had priority over TIFCO to the extent of the downpayment while TIFCO and Jardine had priority as to the balance of the unearned premiums.[18] The district court affirmed the bankruptcy court's decision and ABT further appealed.

The circuit court in *Barton Industries* affirmed in all respects. Because the State of Oklahoma also had adopted UCC

---

17. In *Expressco,* the insurance premium financier did not give notice to the insurer that it had obtained an assignment of the debtor's right to unearned premiums or of its power of attorney to cancel the policies upon the debtor's default. 99 B.R. at 396.

18. Presumably, any other amount that the debtor owed ABT under the credit agreement would be satisfied, if at all, from a source other than the unearned premiums.

§ 9–104(g), the circuit court looked to existing statutes and pre-UCC case law, analogy to the UCC, and case law from other jurisdictions to determine the priority dispute between ABT and TIFCO.[19] The circuit concluded that ABT had a valid security interest in the unearned premiums to the extent of the downpayment and had complied with the pre-UCC method for perfecting a security interest in a chattel mortgage, i.e., by publicly filing a notice of its security interest, which also is a method recognized under the UCC. 104 F.3d at 1247.[20] Alternatively, the circuit court also concluded that ABT had perfected its interest because "it executed the agreement and/or had possession of it." Id.[21] As to TIFCO, the court concluded that it too had a valid security interest in the unearned premiums by virtue of paying the premiums and obtaining an assignment of any unearned return premiums. Id.

The court then applied a "first in time, first in right" approach "to resolve competing security interests in the same collateral." Id.[22] Based on that approach, the Barton Industries panel concluded that ABT had perfected its interest to the extent of the downpayment amount prior to the creation of TIFCO's interest under the premium financing agreement. Id. It appears that the court relied on the pre-existing credit agreement that had given ABT a security interest in all intangible assets since that was the only agreement executed by the debtor prior to the premium financing agreement. Id. The circuit therefore affirmed the decisions below.

All of the aforementioned cases were discussed by the court in In re JII Liquidating, Inc., 344 B.R. 875 (Bkrtcy.N.D.Ill. 2006). In that case, the debtor's predecessor had purchased various insurance policies to cover its automotive parts operation. It entered into a premium finance agreement with Premium Assignment Corporation ("PAC"). The finance agreement was signed by the debtor, PAC and the two agents through which the insurance policies were purchased. Under the premium finance agreement, the debtor granted PAC a security interest in any unearned premiums as well as an irrevocable power of attorney to cancel the policies in the event of the debtor's default in repaying PAC the amount financed. PAC sent written notices to each of the insurers informing them that the policies were being financed by PAC and that a power of attorney had been obtained.

---

19. Even though TIFCO and Jardine resided in Texas and the premium finance agreement was executed in Texas, the court applied Oklahoma law since the debtor and ABT resided and did business in Oklahoma, entered into the credit agreement in Oklahoma, and the debtor commenced its bankruptcy proceeding in Oklahoma. 104 F.3d at 1246 n. 2.

20. It is unclear from the decision what notice was publicly filed by ABT, e.g., a UCC–1 financing statement or other document, or, for that matter, where it was filed.

21. It is unclear from the decision what agreement the circuit panel is referring to since it refers in a footnote to cases such as Big Squaw Mountain involving possession of a premium financing agreement, not a credit agreement with the debtor's lender. 104 F.3d at 1247 n. 3.

22. It is not clear whether the credit agreement gave ABT a security interest in after-acquired intangible assets. It also is not clear whether the court considered the priority question raised by U.S. Repeating Arms: are the parties claiming the "same collateral" where one has extended the funds to purchase the collateral, while the other party is relying on an after-acquired property clause in a general security agreement? Perhaps it was unnecessary since both ABT and TIFCO provided the financing necessary for the debtor to acquire the insurance policies, i.e., ABT provided the downpayment and TIFCO provided the rest.

The debtor and related entities then filed a voluntary Chapter 11 petition. The debtor defaulted in its payment of the monthly installments to PAC under the premium finance agreement and PAC filed a motion for adequate protection or for relief from automatic stay to cancel the policies and to obtain the unearned premiums. The court granted relief from stay to permit PAC to cancel the insurance policies provided that the insurers would hold the unearned premiums pending a determination of rightful ownership. The case was then converted to Chapter 7 and a trustee was appointed. The court subsequently ordered the insurers to remit the funds to the Chapter 7 trustee to be held in escrow. It then held an evidentiary hearing on PAC's request to obtain the funds.

Applying Illinois law, the *JII* court first determined that Article 9 of the UCC did not apply to the transfer or assignment of an interest in an insurance policy pursuant to UCC § 9–109(d)(8) (the successor to UCC § 9–104(g)). 344 B.R. at 882–84, citing, inter alia, *U.S. Repeating Arms*, *Uly–Pak*, *Big Squaw Mountain* and *Barton Industries*, as well as *RBS Industries*, *Redfeather Fast Freight*, *Maplewood Poultry* and *Lindsey*. It then proceeded to determine whether PAC had a valid security interest in the unearned insurance premiums. Rejecting the Chapter 7 trustee's argument that PAC did not have a separate, written security agreement, the court first noted that all that was required is an effective assignment of the insured's

right to unearned premiums, as well as a right to cancel the insurance policies in the event of nonpayment. 344 B.R. at 885, *citing Uly–Pak*. It further rejected the trustee's argument that PAC was required to file a UCC–1 financing statement to perfect its security interest. Having already determined that the UCC does not apply to such transactions, the court was not inclined to impose a requirement that did not exist. It also rejected any argument that a UCC–1 financing statement filing was required because the Illinois Insurance Code had not addressed the issue.[23] Finally, the court rejected application of the Article 9 policy against "secret liens" since the UCC specifically exempted insurance premium finance transactions. 344 B.R. at 886, *citing Maplewood Poultry*.[24] The court therefore concluded that PAC had a valid security interest in the unearned premiums even though it had not publicly filed a notice.

The *JII* court also found that PAC had complied with the Illinois statutes governing the formation of premium financing agreements, 344 B.R. at 886–889, that its irrevocable power of attorney had survived the debtor's bankruptcy filing, 344 B.R. at 889, and that anti-assignment clauses in the insurance policies were inapplicable to PAC's right to the unearned premiums. *Id.* at 890. It therefore concluded that PAC's interest in the unearned premiums were superior to the trustee's rights as a hypothetical lienholder under Section 544(a).[25] Thus, the *JII* court granted re-

---

**23.** That other states had enacted statutes expressly providing that a filing is not necessary to perfect the financier's interest was not persuasive to the *JII* court. 344 B.R. at 886 n. 13.

**24.** Quoting from *Maplewood Poultry*, 2 B.R. at 555, the *JII* court emphasized that any public policy against secret liens is not threatened by the exemption of insurance premium financ-

ing from the UCC requirements "any more than the enforcement of a security interest in a motor vehicle duly noted on a certificate of title."

**25.** In the instant adversary proceeding, the Trustee has not sought to challenge the interests of AICCO or Orix under any avoidance theory. Arguably, such a challenge should have been asserted as a compulsory counter-

lief from stay so that PAC could obtain from escrow the unearned premiums that had been remitted by the insurers.[26]

While none of the foregoing cases involved the precise facts before this court, the persistent theme is that the policy concerns of the UCC are important but do not direct the result in the area of insurance premium financing. In each instance, the courts recognized that the insurance premium financier had in fact provided the financial means by which the insured obtained coverage harkening to the "purchase money" language that found its way into the *Anderson Brothers Ford* decision, *see* discussion at note 13, *supra,* and which was repeated in *U.S. Repeating Arms.*[27] In each instance, the financier also had, at a minimum, obtained an enforceable assignment of the insured's interest in unearned insurance premiums. In each instance, the financier also apparently had, at a minimum, obtained a right to cancel the insurance policies upon default of the insured.[28]

■ Based on the foregoing, this court concludes that a company must obtain a valid assignment from the insured of the right to the unearned insurance premiums, that it also must obtain authority from the insured to cancel the underlying insurance policy or policies upon default, and that notice of the assignment must be given to the insurer. Notice to the insurer is necessary since the insurer holds the premiums and they are unearned until the insurance policy expires. The court does not believe that possession of the premium financing agreement is required since it is not a negotiable instrument.[29] Likewise, the court does not believe that a notice filing is required since insurance premium financing is specifically exempted from Article 9 of the UCC.[30] Finally, the court

---

claim or crossclaim under FRCP 13(a) and 13(g). The answer filed by the Trustee did not include either of such claims. Bankruptcy Rule 7013, however, may provide a basis for relief to a trustee under certain circumstances.

**26.** *See also In re Sage Enterprises,* 2004 Bankr.LEXIS 2453 (Bankr.N.D.Ill. Nov. 12, 2004)(relief from stay granted to insurance premium financier on finding that financier's security interest in unearned premiums was superior to that of operating lender that took security interest in general intangibles).

**27.** Although the UCC does not apply to insurance premium financing, such transactions appear to be consistent with the definition of a "purchase money obligation" under UCC § 9–103(a)(2), to wit: " 'purchase money obligation' means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." *Compare Americredit Financial Services v. Penrod (In re Penrod),* 392 B.R. 835, 844–45 (9th Cir. BAP 2008)(distinguishing between "seller-based" and "financier-based" purchase money security interests under UCC § 9–103(a)(2)).

**28.** It is not clear from the *Barton Industries* opinion whether TIFCO had obtained a cancellation right since it was the debtor that cancelled the policies.

**29.** While the opinions in *Big Squaw Mountain* and *Barton Industries* refer to possession of the agreements discussed, this court believes that possession of a premium financing agreement by the financier would serve no public notice purpose. In any event, the court assumes that AICCO has possession of both PFAs since NRS 686A.430 only requires that a copy of the premium financing agreement be provided to the insured.

**30.** For the same reason, a creditor cannot rely on a notice filing without meeting these requirements since the UCC is inapplicable to the perfection of an interest in unearned insurance premiums. Thus, a UCC–1 financing statement that is filed "first in time" is legally irrelevant to insurance premium financing and therefore would not be "first in right." *Compare U.S. Repeating Arms, supra,* 67 B.R. at 997–998.

further concludes that a company meeting these requirements has a security interest in the unearned premiums with priority over any other creditor of the insured that does not meet these requirements.[31]

These conclusions are consistent with NRS 686A that specifically requires the insurer to return to the premium financing company any unearned insurance premiums that facilitated the insured's acquisition of coverage. The legislative intention apparently was to ensure that the premium financing company receives any unearned insurance premiums so that the amount could be applied promptly against any balance owed by the insured.[32] Nothing in this statutory scheme requires the insurer to notify any third party of its return of the unearned premiums nor is the premium financing company required to notify any third party of its payment of any excess to the insured. Moreover, as the court observed in *Big Squaw Mountain*:

> "... the drafters of the U.C.C. considered the area involving claims to and under insurance policies to be sufficiently distinct and well regulated to warrant their exclusion from Article 9's filing requirements. The U.C.C. exclusion serves to alert all parties that rights and claims under insurance policies, including rights in unearned premiums, are matters sufficiently unique to require

diligent inquiry before advancing credit with the expectation that they may be made to serve as reliable security."

122 B.R. at 839.

## II. Perfection and Priority of the AICCO PFAs.

As previously set forth, under Paragraph 8 of both PFAs the Debtor assigned to AICCO a security interest in the identified insurance policies including any return of the policy premiums. Additionally, Paragraph 3 of both PFAs authorized AICCO to cancel the identified insurance policies upon default in payment. To carry out that authority, Paragraph 2 of both PFAs appointed AICCO as attorney-in-fact to cancel the policies upon default and to receive all sums assigned to AICCO, including the unearned premiums.

 The assignability of rights generally depends on local law. *See, e.g. Danning v. Mintz*, 367 F.2d 304, 308 (9th Cir.1966). Under Paragraph 21 of both PFAs, Nevada law would apply. Like any other valid agreements, assignments are enforceable under Nevada law. *See, e.g. Wood v. Chicago Title Agency of Las Vegas, Inc.*, 109 Nev. 70, 847 P.2d 738 (Nev.1993)(assignment of escrow account). An assignment of a right is a manifestation of the assignor's intention to transfer it by

**31.** The court in *Barton Industries* gave priority to the security interest of the lender that provided the downpayment for the insurance policies at issue based on a pre-existing credit agreement for which some form of notice had been filed. *See* discussion at notes 20–22, *supra*. No similarity exists as to the downpayment in the instant case. Moreover, this court disagrees with *Barton Industries* because it effectively imposed a UCC requirement on the financier.

**32.** The court in *Sage Enterprises* observed: "One of the principal reasons for granting purchase money lenders priority is to prevent

a prior lender with a blanket lien from obtaining a stranglehold on the debtor's financial situation. Where the prior lender refuses to advance funds necessary for acquisitions, it becomes difficult, without a purchase money priority, for the debtor to obtain alternative financing.... Indeed, if such priority were unavailable to a premium finance company (or to any lender funding the acquisition of an insurance policy), it could be practically impossible for financially troubled debtors to obtain the insurance necessary to operate their businesses." 2004 Bankr.LEXIS 2453 at *23.

virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance. *See* Restatement (Second) of Contracts, § 317 (1981). An assignee typically "steps into the shoes" of an assignor. *See In re Boyajian*, 367 B.R. 138, 145 (9th Cir. BAP 2007).

No issue has been raised as to the validity of the assignment provisions of the PFAs or of the effectiveness of the power of attorney granted to AICCO in the event of default. Both Orix and the Trustee have argued, however, that (1) the PFAs are invalid under NRS 686A.420 because it lacks the required type size [33] and (2) that AICCO failed to submit to the PFAs to the Nevada Insurance Commissioner for approval under NRS 686A.390(1).

■ Upon review of the PFAs, however, the court concludes that they substantially conform to the requirements of NRS 686A.420. More importantly, even if AICCO failed to strictly comply with those requirements, nothing contained in NRS 686A invalidates AICCO's security interest in the unearned premiums. Rather, the penalty for violating the form requirements of the statute is a penalty not to exceed $1,000. *See* NRS 686A.510. Com-

*pare JII Liquidating, supra*, 344 B.R. at 887–888.[34]

No issue has been raised as to whether AICCO gave notice to the broker of the PFAs. For both PFAs a Notice of Acceptance was sent to the broker, Airsure Ltd., LLC, advising that a premium finance agreement had been entered with the Debtor and that "All gross unearned premiums which become available under the financed policies .... must be paid to us." For both PFAs a Notice of Acceptance also was sent to each insurer, advising that a premium finance contract had been entered with the insured, that any and all unearned premiums had been assigned to AICCO, and that the insured had given AICCO the right to cancel the policy upon default in payment. *See* Supplemental Chandler Affidavit at ¶¶ 4 and 5 and Exhibits "1" and "2" attached thereto.[35]

Under these circumstances, both PFAs therefore meet all of the requirements for AICCO to perfect its security interest in the unearned insurance premiums. The same cannot be said for Orix[36]. There being no genuine issue as to any material fact, the court concludes that AICCO is entitled to judgment as a matter of law.

---

**33.** The same or similar arguments were raised by the Trustee in his initial opposition and joinder in the opposition of Orix.

**34.** AICCO offered to provide evidence that the PFAs were approved by the Nevada Insurance Commissioner, *see* AICCO Reply at 10:20–27 & n. 7, but the evidence was not requested by the court. The question was not pressed by Orix or the Trustee at oral argument and the court concludes that there is no genuine issue as to the Commissioner's approval of the forms.

**35.** At the final hearing on the SJ Motion, Orix orally requested that the exhibits attached to the Supplemental Chandler Affidavit be stricken on grounds that counsel may not

have seen the exhibits previously, perhaps due to a stay of discovery that was entered at a hearing on October 2, 2008. The court deferred a ruling on the request. The court overrules the objection because the record reflects that Orix had conducted discovery prior to the October 2, 2008 hearing, including document subpoenas directed to the insurance broker and various insurance companies.

**36.** As previously indicated in note 8, *supra*, the broker's commissions under the PFAs are not separate from the unearned premiums and the UCC–1 filing by Orix also does not confer priority status with respect to the commissions.

## CONCLUSION

For the reasons set forth, AICCO's Motion for Summary Judgment must be granted. A separate order has been entered concurrently herewith.